**In re McFARLIN'S, INC., Debtor.**

**No. 82–20306.**

United States Bankruptcy Court,
W.D. New York.

May 30, 1985.

Woods, Oviatt, Gilman, Sturman & Clark by Paul S. Groschadl, Rochester, N.Y., for Marine Midland Bank, N.A.

Weinstein, Vullo & Miller, by Richard P. Vullo, Rochester, N.Y., for McFarlin's, Inc.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

This is a motion by a creditor, consisting of three officers of the debtor, to amend its claims resulting from the debtor's rejection of an unexpired lease. Marine Midland Bank, the largest unsecured creditor, and the unsecured creditor's committee, by cross motion, object to and request the subordination of the claims filed by three officers of the debtor. A hearing was held on May 29, 1984. The parties subsequently submitted legal briefs and the matter was submitted for decision.

The facts are as follows. The debtor, McFarlin's, Inc., was a men's retail clothing business in Rochester, New York. The officers of the debtor were Mr. and Mrs. Robert C. Greene, Jerry R. Greenfield, and Stanley M. Friedman. These four individuals owned 100 percent of the Class A voting stock of McFarlin's. Friedman and Greenfield also owned 140 of the 790 shares of the Class B non-voting stock. In addition to being stockholders, Friedman and Greenfield were the debtor's attorneys prior to the debtor filing bankruptcy.

In 1981, in an effort to expand the McFarlin's operation, the officers decided to open an additional store at 3300 Monroe Avenue. The vacant store needed to be outfitted with leasehold improvements, furniture, fixtures and other items costing $74,389.37. McFarlin's, however, did not have the necessary capital to buy these improvements. The debtor's officers informally spoke with Marine Midland Bank's officers regarding a loan to McFarlin's for the improvements. The bank's officers said no financing was available for McFarlin's. To obtain the capital, Friedman, Greenfield and Greene formed a partnership called F.G. & G. and personally guaranteed the loan. The officers, however, never attempted to secure the loan in McFarlin's name by offering their personal guarantee.

On April 24, 1981, McFarlin's, the debtor, entered into a lease agreement with F.G. & G. Therefore, the creditor in this case, F.G. & G., consisted of virtually the same individuals who made up the debtor's corporate officers.[1] During the lease negotiations, McFarlin's was represented by its President Mr. Greene (also a partner in F.G. & G.) and F.G. & G. was represented by one of its partners Mr. Friedman (also an officer of McFarlin's). Mr. Friedman was also general legal counsel to McFarlin's at that time. McFarlin's agreed to a five year lease of the leasehold improvements commencing on May 1, 1981, with monthly payments of $3,000.

On March 16, 1982, McFarlin's filed bankruptcy under Chapter 11. On September 7, 1982, the debtor received court approval to reject the real property lease for the store at 3300 Monroe Avenue. Additionally, through a Chapter 11 plan confirmed on September 18, 1984, the debtor rejected its remaining executory contracts and unexpired leases; among them the F.G. & G. improvements lease.

The debtor made all of its pre-petition payments to F.G. & G. under the leasehold improvements lease from May 1, 1981 through March 31, 1982. Post-petition use of the improvements, however, continued through September 1982, with no payments to F.G. & G.

■ Initially, F.G. & G. filed proof of claim number 47 as an unsecured claim for $18,000 representing six months post-petition rent for the leasehold improvements; April through September 1982. On May

---

1. The only officer of the debtor not a partner in F.G. & G. was Mrs. Greene.

21, 1984, F.G. & G. made a motion to amend claim number 47 to have the unpaid lease payments declared an administrative expense pursuant to 11 U.S.C. § 503(a). F.G. & G. also filed proof of claim number 48 as an unsecured claim for $133,193.50, the alleged unpaid rental on the balance of the improvements lease.[2]

F.G. & G. also holds proof of claim number 59 by assignment from the real property lessor. Claim number 59 is an administrative expense claim for $10,000 post-petition rent plus $1,806.50 in real property taxes. By court order dated December 28, 1982, the $10,000 rent claim by the landlord was allowed as an administrative expense, but allowance of the $1,806.50 real property tax claim was reserved upon because there was a question as to whether part of the taxes were due prior to the filing of the Chapter 11. That portion of the taxes which represents a pre-petition debt would not be allowed as an administrative expense.[3] The landlord assigned his administrative rent claim to F.G. & G. in exchange for title to the leasehold improvements in settlement of the landlord's action to obtain those improvements.

The first question presented is whether the objecting creditors have met their burden of coming forward to overcome the fiduciaries prima facie case, the verified proof of claim. The second question presented is whether the claims of F.G. & G. should be subordinated to the claims of the general unsecured creditors pursuant to 11 U.S.C. § 510(c). The third question presented is whether the lease was an actual lease or a disguised sale.

In the case at bar, the claimant is F.G. & G., consisting of three individuals who are controlling stockholders and corporate officers of the debtor. A dominant or controlling stockholder or group of stockholders is a fiduciary. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238 at 245, 84 L.Ed. 281, 289 (1939) citing *Southern Pacific Co. v. Bogert,* 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099, 1107 (1919). "Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. *Pepper v. Litton,* 308 U.S. at 306, 60 S.Ct. at 238, (citations omitted). Even though the fiduciaries have the ultimate burden of proof, the objecting party must first meet his burden of coming forward, to overcome the fiduciary's prima facie case, the verified proof of claim. See *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977) and *In re Multiponics,* 622 F.2d 709, 714 (5th Cir.1980).

In this case, the objecting creditors have come forward with facts which substantiate their assertion of exorbitant interest rates, bad faith, and unfair dealings on the part of F.G. & G. The excessive leasing payments, with an effective annual interest rate of over 42 percent and without any equity accruing to the debtor, are by themselves very persuasive factors. Additionally, F.G. & G. was owed no pre-petition debt while the debtor's total unsecured pre-

---

**2.** The total amount to be paid over the term of the lease was $180,000 (60 months times $3,000 per month). The debtor had already paid F.G. & G. $33,000 (May 1, 1981 through March 31, 1982) and had a credit for $13,806.50. Therefore, the total amount due on the lease is $133,-193.50 which is claimed by claim number 48, therefore, claim number 47 duplicates part of claim number 48. Additionally, pursuant to 11 U.S.C. §§ 365(g) and 502(g), the claim resulting from the rejection of an unexpired lease is treated as an unsecured claim and, therefore, claim number 47 for an administrative expense is disallowed as improper and duplicative of claim number 48. See also *N.L.R.B. v. Bildisco &*

*Bildisco,* 465 U.S. 513, ——, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482, 499 (1983).

**3.** The $1,806.50 real property taxes due cover the period from January 1, 1982 through June 30, 1982. The debtor's petition in bankruptcy was filed on March 16, 1982. Therefore, only $1,053.78 of the taxes due will be allowed as an administrative expense ($301.08 per month times 3.5 months). The remainder represents pre-petition debt. The total amount of claim 59 is, therefore, $11,053.78 ($10,000 plus $1,053.78).

petition debt to other creditors was $272,992.41. Therefore, the objecting party has met its burden of coming forward and the burden now shifts to the officers to prove the transaction's good faith and inherent fairness.

"The fundamental aim of equitable subordination is to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *In re Westgate California Corporation,* 642 F.2d 1174, 1177 (9th Cir.1981) quoting *In re Kansas City Journal-Post Co.,* 144 F.2d 791, 800 (8th Cir.1944). "Section 510 incorporates into the statute the doctrine of equitable subordination as it has been developed, and continues to be developed, by the courts." *Reiner v. Washington Plate Glass Co., Inc.,* 27 B.R. 550 (D.C.Cir.1982) citing S.Rep. No. 989, 95th Cong., 2d Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

11 U.S.C. § 510 provides in pertinent part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of another allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

Courts have required that three conditions exist before exercise of the power of equitable subordination is appropriate.

(i) The claimant must have engaged in some type of inequitable conduct. *Comstock v. Group of Institutional Investors,* 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911, 1923 (1948); *Spach v. Bryant,* 309 F.2d 886, 889 (5th Cir. 1962); *Frasher v. Robinson,* 458 F.2d 492, 493 (9th Cir.1972), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972).

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant. *Comstock v. Group of Institutional Investors,* 335 U.S. at 229, 68 S.Ct. at 1463, 92 L.Ed. at 1923; *In re Branding Iron Steak House,* 536 F.2d 299, 302 (9th Cir.1976); *In re Brunner Air Compressor Corp.,* 287 F.Supp. 256 265 (N.D.N.Y.1968); see *Wages v. Weiner,* 381 F.2d 667, 670 (5th Cir.1967).

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *Luther v. United States,* 225 F.2d 495, 499 (10th Cir.1955), *cert. denied,* 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956); *In re Columbia Ribbon Co.,* 117 F.2d 999, 1002 (3d Cir.1941); see *American Mutual Life Ins. Co. v. City of Avon Park, Florida,* 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91, 95 (1940), quoting *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293, 1303 (1940); *In re Texas Consumer Finance Corp.,* 480 F.2d 1261, 1265 (5th Cir.1973).

*In re Mobile Steele Co.,* 563 F.2d 692, 700 (5th Cir.1977). "The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." *Pepper v. Litton,* 308 U.S. at 306–307, 60 S.Ct. at 245, 84 L.Ed. at 289.

The first condition for equitable subordination is inequitable conduct by the claimants. In the case at bar, the debtor's officers informally inquired about a loan to McFarlin's to finance the purchase of the leasehold improvements and were unofficially denied such a loan. Instead of offering their personal guarantees on behalf of the debtor, the officers formed a separate partnership for the sole purpose of acquiring the capital to buy the leasehold improvements. F.G. & G. then leased the improvements to the debtor for five years at a total rental cost of $180,000. The officers were still personally liable for the loan obtained by F.G. & G., but now

they were able to make a sizeable profit from the transaction and take tax deductions. If the debtor's officers had personally guaranteed a $75,000 loan to McFarlin's, the loan probably would have been granted and the debtor would have been able to buy the improvements and only pay a total of approximately $120,000; sixty monthly payments of approximately $2,000 at the then prevailing interest rates.

What happened, however, was that the debtor's officers created a leasing arrangement costing the debtor an additional $60,000 over the five years, at the end of which the debtor would have no title to the improvements and no option to buy the improvements. The partners of F.G. & G. testified that they planned to renew the lease with the debtor. Such a plan would have only further increased the debtor's expenditure on the improvements, while increasing the profits earned by the members of F.G. & G.

■ Assuming arguendo that the debtor's officers intended to transfer title of the improvements to McFarlin's at the end of the five year lease, the effective annual rate of interest on the $75,000 loan would be 42.36%. A loan at such an outrageous rate is unconscionable.[4]

■ If viewed as a lease, it is important to note that in five years the debtor is paying 150 percent of the financed cost of the improvements just to rent them. Instead of trying to save the debtor $60,000 by personally guaranteeing a loan in the debtor's name, the officers attempted to reap profits and reduce their risk of loss with a lease, exploiting their fiduciary position. This transaction was not an arm's length bargain. It lacked good faith and was clearly inequitable.

The second condition for equitable subordination is an injury to the creditors or an unfair advantage to the claimant. In the case at bar, there are both. The officers testified that one of the primary reasons for F.G. & G. to lease improvements to the debtor was the accounting benefit of off-sheet financing (Transcript of May 29, 1984 at 21 and 52). By using the off-sheet principle, the debtor was not required to show the leasehold improvements lease on its balance sheet. Therefore, creditors dealing with McFarlin's could not accurately appraise the debtor's financial condition and liabilities. With this somewhat distorted financial picture, creditors may have dealt with the debtor and incurred liabilities which they otherwise may not have incurred if they were aware of the debtor's financial situation. The officers purposefully created an inaccurate financial picture of the debtor to fool creditors and the public. Creditors who otherwise might have required cash on delivery terms continued to extend credit to the debtor and increase their unsecured losses.

Additionally, the claimants gained an unfair advantage over other creditors. The debtor's petition lists secured debts of $685,006.24 and unsecured debts of $272,992.41. Interestingly enough, F.G. & G. has no pre-petition claim. Prior to filing its petition in bankruptcy, the debtor made every $3,000 payment due to F.G. & G. The decision by the officers to make these substantial payments on behalf of the debtor to F.G. & G. and not to other creditors, conferred an unfair advantage on the officers to the detriment of other creditors. Clearly, the officers preferred paying themselves over paying other creditors.

■ The third condition for equitable subordination is that the subordination be consistent with the provisions of the Bankruptcy Code. One of the functions of bankruptcy is the fair and orderly distribution of the debtor's assets among the creditors. Where insiders have injured the debtor, preferred themselves over the other creditors, and created an unfair bargain, the

---

4. In New York, a corporation is not allowed to interpose a defense of usury, except criminal usury, in any action. New York General Obligations Law § 5–521. Criminal usury in New York is when a person knowingly charges an annual interest rate of more than twenty-five percent. New York Penal Law §§ 190.40, 190.42. If viewed as a loan, this transaction appears to be criminally usurious.

principles of fairness would be violated if the insiders' claim was allowed to share equally with the other creditors. Subordination of a claim is now expressly provided for in § 510(c) of the Bankruptcy Code and there does not appear to be any inconsistency with the Code in subordinating F.G. & G.'s claims. The debtor's officers have failed to prove the good faith and inherent fairness of the lease and, therefore, all of F.G. & G.'s claims will be equitably subordinated to the claims of the general unsecured creditors.

■ In addition to the three prong test for equitable subordination, undercapitalization is recognized as a ground for subordinating fiduciaries' claims. *Pepper v. Litton,* 308 U.S. at 309–10, 60 S.Ct. at 246–47, 84 L.Ed. at 291; *In re Mobile Steel Co.,* 563 F.2d at 702–703; *In re Multiponics, Inc.,* 622 F.2d at 717; *In re N.A.B. Food Services, Inc.,* 32 B.R. 128 (Bankr.S.D.Ohio 1983); *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *Braddy v. Randolph,* 352 F.2d 80 (4th Cir.1965). The primary inquiry is "whether, under the circumstances, reasonably prudent men with general business background would deem the company undercapitalized." *In re Multiponics, Inc.,* 622 F.2d 709 citing *In re Mobile Steel Co.,* 563 F.2d at 703. The court in *Mobile Steel* went on to set out two definitions of undercapitalization.

(1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;

(2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source. 622 F.2d at 717 citing 563 F.2d at 703.

■ In the case at bar, the relevant time to consider whether the debtor was undercapitalized was when the additional store was being added. The Monroe Avenue store was a new venture which required a large amount of additional capital to support its inception and continued operation. Although no evidence was submitted on the first standard, evidence on the second standard is on the record. Mr. Greene testified that the Marine Midland Bank officers refused to lend McFarlin's money on the basis of McFarlin's assets (Transcript of May 29, 1984 at 50–51). McFarlin's clearly fails the second test and, therefore, was undercapitalized.

■ Creditors and shareholders assume different risks and receive different rewards. When an entity is undercapitalized, a shareholder, however, should not be allowed to structure his capital contribution as a loan or lease to reduce his risk of loss.

Both the shareholders and the creditors in any enterprise assume some risk of its failure, but their risks are different. The shareholders stand to lose first, but in return they have all the winnings above the creditors' interest, if the venture is successful; on the other hand the creditors have only their interest, but they come first in distribution of the assets. Beneficially considered, the same persons are both creditors and shareholders, when they have organized into two corporations under a single control. If in such a case they are allowed to prove in insolvency on a parity with other creditors, as shareholders of the debtor they can use their control to take all the winnings which may be made on their advances while the company is successful, yet they will expose themselves only to creditors' risks, if it fails. That is unfair to other creditors regardless of whether they know that the shareholders of the debtor corporation have this power through their common ownership; for every creditor rightly assumes that his risk is measured by the collective claims of other creditors, and by creditors he understands those alone, who like him, have only a stipulated share in the profits. To compel him to divide the assets in insolvency with those who at their option have all along had power to take all the

earnings, is to add to the risk which he accepted. *In re Gambrinus Brewery Co.*, 167 F.2d 318, 320 (2d Cir.1948).

In the case at bar, by creating a lease, the debtor's officers sought to avoid the risk of making a capital contribution, which would have occurred if they had personally guaranteed a loan to McFarlin's on which McFarlin's defaulted. Equity should not allow these fiduciaries to share in the distribution of the debtor's assets on a par with the other creditors when the corporation was undercapitalized. Therefore, according to the undercapitalization standard, all of F.G. & G.'s claims should be subordinated to the claims of the general unsecured creditors.

Having decided that F.G. & G.'s claims should be subordinated to the general unsecured creditors' claims, it is unnecessary to decide whether the lease was a true lease or a disguised sale. Such an analysis would only determine what portion of F.G. & G.'s claims were secured or unsecured.

For example, if the lease were found to be a true lease, F.G. & G.'s entire claim resulting from the rejection of the executory contract would be an unsecured claim pursuant to 11 U.S.C. §§ 365(g) and 502(g). See also *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, ——, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482, 499 (1983). On the other hand, if the lease were found to be a disguised sale, F.G. & G. which had filed a U.C.C.–1 financing statement would be a secured creditor to the extent of the value of the collateral and an unsecured creditor for the remainder. See 11 U.S.C. § 506. If this Court were to determine that a fixture filing was required for F.G. & G. to hold a perfected secured claim and if F.G. & G. had not filed the appropriate U.C.C.–1 financing statements, F.G. & G. would then be unsecured for its entire claim. Regardless of how F.G. & G.'s claims are classified, having decided that those claims will be equitably subordinated to the claims of the general unsecured creditors, it is unnecessary for this Court to make such an analysis.

Additionally, the fact the F.G. & G. holds a claim as an assignee does not prevent subordination. The administrative rent claim was assigned as part of a settlement of litigation between the landlord and F.G. & G. regarding title to the leasehold improvements. The assigned claim arose out of the very same transaction which produced F.G. & G.'s other claims and, therefore, shall be treated as F.G. & G.'s other claims arising from that inequitable transaction; namely it is subordinated. F.G. & G. will not be allowed to benefit from the leasehold improvements lease where their conduct was inequitable, where their conduct injured the debtor's business by reducing its cash flow, and where F.G. & G. preferred itself over other creditors.

For the foregoing reasons, it is decided that: claim number 47 is disallowed because it duplicates claim number 48 and is not entitled to administrative expense priority; the total amount of claim number 48 is $133,193.50 and that the determination of the classification of that claim is unnecessary; the total amount of F.G. & G.'s claim number 59 is $11,053.78; the lease of the leasehold improvements by F.G. & G. to McFarlin's was not an arm's length bargain, lacked good faith and was clearly inequitable; the officers of McFarlin's created an inaccurate financial picture of McFarlin's by using off-sheet financing; the officers of McFarlin's preferred paying F.G. & G. rather than paying other creditors; and McFarlin's was undercapitalized for its Monroe Avenue store venture and, therefore, all of F.G. & G.'s claims are subordinated to those of the general unsecured creditors and it is so ordered.