In re McCORHILL PUBLISHING, INC., Debtor.

McCORHILL PUBLISHING, INC. by Harvey S. BARR, as operating Trustee

v.

GREATER NEW YORK SAVINGS BANK, Superior Funding Corp., Kraus–Thompson Organization, Ltd., Ian Yung, Chen Hu, Mary Hu, the Cahill Trust, Enercomp, Inc., Stephen Flaks, Javid Corporation, Citytrust, "John Doe" and "Jane Doe", the last two names being fictitious and intended to designate other alleged secured creditors of debtor, if other than defendants heretofore named, Defendants.

Bankruptcy No. 87 B 20104.
No. 88 Adv. 6019.

United States Bankruptcy Court, S.D. New York.

May 19, 1988.

---

Barr and Faerber, Spring Valley, N.Y., for plaintiff.

Patrick Damanti, New York City, for Greater New York Sav. Bank.

Michael Gottlieb, Middletown, N.Y., for Superior Funding Corp.

Hahn & Hessen, New York City, for Kraus–Thompson Organization Ltd.

## DECISION ON VALIDITY, EXTENT AND PRIORITY OF LIENS

**HOWARD SCHWARTZBERG, Bankruptcy Judge.**

In an adversary proceeding commenced to determine the validity, extent and priority of liens filed by numerous creditors of the debtor, McCorhill Publishing, Inc, the Chapter 11 trustee seeks a determination by this court declaring certain liens void or voidable. To the extent any existing rights and interests of these creditors may be avoided by the trustee, he requests that these interests be preserved for the benefit of the debtor's estate.

### FACTUAL BACKGROUND

#### Kraus–Thomson Organization

1. At a closing held on November 30, 1984 (the "Closing"), the debtor purchased certain real property and improvements of Kraus–Thomson Organization Limited ("KTO") located in Millwood New York, and a substantial portion of KTO's reprint and antiquarian business, for a total price of $7,750,000. Pursuant to the sale agreement, KTO received $5,000,000 and a "Real Estate Promissory Note" in the principal amount of $2,750,000 ("Promissory Note"). Ex. 10.

2. In connection with the Promissory Note, the debtor executed a security agreement which listed as collateral, furniture, equipment and fixtures, the right to use various Kraus–Thomson names, and "all proceeds of contracts, accounts receivable and other intangibles owned by the debtor". ("KTO Security Agreement"). Ex. 10.

3. Contemporaneously with the execution of the Security Agreement, the debtor and KTO executed a "Conditional Assignment" which provided, in relevant part, that the debtor would assign

all proceeds of existing or future contracts, accounts receivables and other intangibles owned by Debtor ... No further act on the part of BORROWER shall be necessary to assign all of its right, title and interest in and to future contracts, accounts receivable and other intangibles, ... *Notwithstanding anything contained herein to the contrary, this assignment shall be deemed conditional until a default by BORROWER* under the terms of the Agreement of Sale and Purchase dated March 23, 1984, as amended, or the Real Estate Promissory Note, Mortgage or Security Agreement, or any other documents referred to therein. (emphasis added).

Ex. 10.

4. On November 26, 1984 and November 28, 1984, prior to the Closing, KTO filed UCC–1 financing statements with the New York State Secretary of State (# 269557) and in Westchester County (# 84–12399), respectively, with respect to the Debtor's accounts receivable. On December 13, 1984 and January 7, 1985, KTO filed UCC–1 financing statements in Westchester County (# 84–13089) and with the New York Secretary of State (# 003126), respectively, as to the debtor's furniture, fixtures, equipment, inventory, accounts receivable, and other chattels. Exs. 1,2,8.

#### Greater New York Savings Bank

5. At the closing on November 30, 1984, the Greater New York Savings Bank ("GNYSB") loaned $4,000,000 to the debtor, and received in exchange a secured promissory note. Ex. 11.

6. As security for the debt, GNYSB required the debtor to execute a First Mortgage, Extension, Consolidation and Security Agreement ("GNYSB Security Agree-

ment"), wherein the debtor granted GNYSB a lien on the debtor's Millwood real estate and "all chattels, fixtures, personal property used in connection with the premises". Ex. 12.

7. GNYSB filed UCC–1's covering "inventory, fixtures, personalty and chattels" with the New York Secretary of State on January 7, 1985 (# 0031124) and Westchester County on December 13, 1984 (# 84–13089). Exs. 3,8.

8. The trustee disputes the validity of GNYSB's lien on the debtor's inventory. At trial, GNYSB conceded that it is secured by only the Millwood property and the fixtures attached thereto and that the UCC–1 financing statements filed by GNYSB were intended only to perfect its security interest in fixtures, personalty and equipment at the Millwood premises covered by the real property mortgage.

Superior Funding Corporation

9. In the fall of 1984, Alan Tucker ("Tucker"), the president and sole shareholder of Superior Funding Corporation ("SFC"), testified he was informed by Mr. Lewis Schiller ("Schiller"), then the president of Sequential Information Systems, that the debtor was seeking a lender in order to finance the purchase of the KTO properties.

10. In October 1984, Tucker stated he attended a meeting in Westchester County, New York, with Schiller and Gerald Cahill ("Cahill"), an officer of the debtor. At this meeting Cahill explained to Tucker that he was in the process of purchasing a publishing company and needed a loan of $200,000. Cahill stated he only needed the money for 2 weeks. Tucker testified he visited the McCorhill property once before the loan was closed.

11. On November 27, 1984, the debtor signed a promissory note with SFC in the principal amount of $200,000. Ex. 17. The face of the promissory note described the terms of the note which included: (1) the note was to be repaid on December 15, 1984 and carried no interest for the term of the loan; (2) in the event of default by the debtor, the note would accrue interest "cumulatively at the highest legal rate under

the laws of New Jersey"; (3) the debtor agreed to pay reasonable attorney fees incurred in collection of this debt by SFC; and (4) the $200,000 was to be paid to be repaid at Central National Bank located in New York, New York.

12. The loan was secured by a mortgage on the Millwood property and the debtor's accounts receivable, equipment and inventory, all of which are located in New York State. Ex. 14.

13. Tucker testified that all the relevant documents to the closing were signed by him and the debtor's representatives at his attorney's office, located in Milburn, New Jersey, on the day of the closing, November 27, 1984. However, KTO entered into evidence a letter, which Tucker testified was dated and delivered "by hand" on November 27, 1984, signed by George B. McPhillips and addressed to Gerald Kanengiser, SFC's attorney, whose office is located in Milburn, New Jersey, wherein McPhillips states, in relevant part,

I enclose herewith the following *duly executed documents:*

1. Security Agreement
2. New York State UCC–1 (This must be filed with both the Westchester County Clerk and the New York State Secretary of State. I will effect the New York filings for your office if you wish)
3. Promissory note executed by McCorhill Publishing, Inc.
4. Personal guarantees executed by Mr. Terence R. Corwin, Mr. Gerald H. Cahill and me.
5. Affidavit of Title
6. Origination agreement between McCorhill Publishing, Inc. and Mr. Lewis S. Schiller; and
7. Secretary's certificate of the enabling corporate resolutions. (emphasis added).

Ex. 25.

14. The above referenced Security Agreement states "IN WITNESS WHEREOF, the Parties have respectively signed and sealed these presents the day and year first above written" and is signed by Ger-

ald Cahill for McCorhill Publishing Corporation. SFC's name is typed on the document with a place for signature, but it was never signed by a SFC representative. The date referred to is November, 1984. A day of the month is not supplied. Although, the section of the Security Agreement which provides for the signature of a guarantor, is dated November 27, 1984, no guarantor signed the document. Ex. 14.

15. The above referenced promissory note is dated November 27, 1984. The personal guarantees executed are on the back of the promissory note. Tucker testified that he brought the note with him to the closing and McPhillips and Cahill endorsed the promissory note at the closing. It is alleged by Tucker that Corwin was not at the closing, but that his signature was obtained at Newark Airport, where Corwin was waiting to board a plane.

16. The Affidavit of Title is dated November 26, 1984 and was signed by Gerald Cahill. However, this date was crossed out by Kanengiser who notarized Cahill's signature on November 27, 1984. Ex. 20.

17. The Origination Agreement signed by Gerald Cahill as Executive Vice President of the debtor, permitted an origination fee of $6000.00 be paid to Lewis Schiller. This agreement is dated November 26, 1984 and notarized by Kanengiser. The date of notarization was typed as November 26, 1984. This date was crossed out, presumably by Kanengiser, and the date of November 27, 1984 was written. Ex. 24.

18. The Secretary's Certificate, signed by Stanley Schwartz, as Secretary of the debtor, states the terms and conditions upon which the debtor would borrow the $200,000 from SFC. This document is not dated. However, it certifies that a meeting of the Board of Directors of the debtor took place on November 26, 1984 which authorized the debtor to borrow the funds. Stanley Schwartz was not present at the closing. Therefore it may be extrapolated that this document was signed in New York. Ex. 19.

19. Tucker stated a check was delivered to the debtor, at his New Jersey residence, on November 27, 1984.

20. A letter dated November 28, 1984, from Raymond Bogert, Vice President of the debtor, to Gloria Smith, an employee of SFC states, in relevant part,

> In accordance with our arrangement with Mr. Allen (sic) Tucker yesterday, we enclose our check for interest in (sic) amount of $4,000.
>
> \* \* \* \* \* \*
>
> Lastly, we are returning your $200,000 check of yesterday, to be exchanged for a $200,000 *certified* check also payable to McCorhill Publishing, Inc. Kindly give the same to our driver, Mr. Patrick Brady.

Ex. 30. Tucker testified he gave the debtor's representative a cashier's check in New Jersey. Ex. 18.

21. Although the face of the promissory note did not reflect a rate of interest to be accrued for the duration of the loan, the Secretary's Certificate stated one of the terms upon which the debtor would borrow the money from SFC was that "[i]nterest shall be charged at a flat rate of Four thousand ($4,000) Dollars". Additionally, SFC's records indicate that interest was being accrued at 4% per month and reflects a $4,000 interest payment received on November 27, 1984. Ex. 21.

22. The cashier's check received by the debtor, was deposited in Central National Bank, located in New York, New York, and negotiated on November 29, 1984. Ex. 18. Repayment of the loan by the debtor was to be made at Central National Bank. (Transcript of hearing, at 44; Ex. 17).

23. A UCC–1 was filed with the Secretary of State of New York on December 3, 1984 at 9:00 a.m. (# 373438) and a UCC–1 was filed in Westchester County on December 24, 1984 (# 84–13508), which financing statements constitute a lien on the debtor's inventory, equipment, personalty and accounts receivable. Exs. 4, 28.

24. Since incurring this debt, the debtor had repaid $50,000 on the principal, on or about May 15, 1985, and $56,000 in interest, which consists of the following payments: $4,000 on November 27, 1984; $16,000 on February 18, 1985; $8,000 on April 23,

1985; 16,000 on May 15, 1985; $6,000 on JUne 24, 1985; and $6,000 on October 5, 1985. Ex. 21. The balance on the interest and principal on April 30, 1988 are $204,672.42 and $164,690.00, respectively, for a total balance owed of $369,362.42. Ex. 23.

### Citytrust

25. On March 30, 1984, the debtor borrowed $110,000.00 from Citytrust for "a down payment on a leveraged buyout". On June 27, 1984, the debtor borrowed $425,000 for working capital. Two promissory notes were executed by the debtor for these loans. On March 29, 1985, the debtor refinanced its existing Citytrust loans by executing a promissory note for $750,000.00. Ex. 15.

26. On June 25, 1984, the debtor entered into a Security Agreement wherein it granted to Citytrust a security interest in all of the debtor's accounts receivable and inventory. Ex. 16. A UCC–1 was filed on September 13, 1985 with the Secretary of State of New York (# 220905 for inventory, # 220906 for accounts), September 17, 1985 in Westchester County (# 85–10435 for accounts, # 85–10434 for inventory) and September 23, 1985 in New York County (# 85 PN48453 for accounts and # 85 PN48452 for inventory). Exs. 5,6,9.

### The Adversary Proceeding

27. On March 12, 1987, the debtor filed a chapter 11 petition in this court. Pursuant to a decision rendered and an order signed by this court on June 29, 1987, Harvey S. Barr, Esq. was appointed chapter 11 trustee of the debtor. *In re McCorhill Publishing, Inc.,* 73 B.R. 1013 (Bankr.S.D. N.Y.1987).

28. After negotiating a cash collateral stipulation with KTO, the trustee was confronted with strong opposition from all the other major secured creditors. The trustee withdrew his application to have the stipulation approved and, on February 9, 1988, commenced the instant adversary proceeding to have this Court determine the extent, validity and priority of the conflicting interests.

1. An additional filing has been made by an equipment lessor on specific equipment under

### DISCUSSION

Regarding the validity and priority of the various liens on the debtor's assets, the trustee argues that: (1) although KTO was the first creditor to perfect its secured interest against the debtor, the Conditional Assignment allegedly postpones the attachment of the security interest until an event of default, which under the decisions of the Courts of the State of New York in pre-petition litigation between KTO and the debtor has not yet occurred; (2) SFC's loan is usurious and therefore, void under applicable law; (3) GNYSB does not have a valid security interest in the debtor's inventory; and (4) all of these loans may be avoided under 11 U.S.C. § 544 and preserved for the benefit of the estate under 11 U.S.C. § 551.[1]

KTO asserts (1) its security interest in the debtor's accounts receivable attached upon the signing of the security agreement and conditional assignment; (2) even if attachment would only occur upon the debtor's default, the debtor defaulted on the loan on April 11, 1985 and the security interest became effective; (3) the SFC loan is usurious under New York and New Jersey law and, therefore, SFC's Security Interest is void as against KTO; (4) the trustee may not preserve the liens of KTO, GNYSB or SFC; and (5) KTO has a first priority security interest in the collateral.

SFC claims (1) New Jersey law is applicable to the interpretation of the terms of the loan agreement; (2) the trustee and KTO may not raise the defense of usury on behalf of a debtor corporation; (3) SFC has not violated the civil or criminal usury laws of New Jersey; and (4) because KTO's lien on the debtor's accounts receivables, inventory, equipment and personalty was not properly perfected or was perfected after SFC filed its UCC–1 with the Secretary of New of State, SFC has a first lien on the above stated assets of the debtor.

### KTO's Security Interest

■ The trustee has the capacity to sue and be sued under 11 U.S.C. § 323 and may

lease. The filing is not relevant to this proceeding.

commence and prosecute any action or proceeding on behalf of the estate. *See* Bankruptcy Rule 6009; *In re Beery*, 680 F.2d 705, 713.

The trustee, in commencing this action against KTO, does not dispute that KTO has a properly perfected security interest in the debtor's furniture, fixtures, equipment, inventory and other chattel mortgage. However, the trustee disputes KTO's security interest in the debtor's accounts receivable. The trustee argues that as a result of the terms of the Conditional Assignment of the accounts receivable by the debtor to KTO, KTO's rights in the accounts receivable did not attach, and no security interest arose until after a default occurred.

UCC 9–203 states, in relevant part,

(1) ... [A] security agreement is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...; and

(b) value has been given; and

(c) the debtor has rights in the collateral.

(2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching.

The trustee states that he does not dispute that the Conditional Assignment grants a security interest in the accounts, "but that the granting is *expressly and explicitly* conditioned upon the occurrence of an event of default". The trustee points to the language in the Conditional Assignment, which states, "Notwithstanding anything contained herein to the contrary, this assignment shall be deemed conditional until a default by BORROWER under the terms of the agreement of sale and purchase ...".

The trustee cites *In re Dolly Madison Industries, Inc.*, 351 F.Supp. 1038 (E.D.Pa. 1972) *affd* without opinion 480 F.2d 917 (3d Cir.1973), where the court, applying Pennsylvania UCC § 9–204(1), held, the conditional language of the purchase agreement resulted in the failure of a security interest attaching to the collateral until the event of an uncured default in the borrower's payments. *In re Dolly Madison Industries, Inc.*, 351 F.Supp. at 1042. The relevant language of the security agreement in that case stated,

"In the event that AFL shall be in default in the payment of principal or interest under its promissory note ... and if said default shall not be cured within five days after receipt by AFL of notice thereof from seller, then the escrow agent, *upon notice thereof from seller, shall deliver the certificates to seller, whereupon seller rights and obligations in and to the shares represented*" shall attach. (emphasis added).

*In re Dolly Madison*, 351 F.Supp. at 1040.

The conditional language in that purchase agreement served to vest rights in the collateral when the escrow agent delivered the certificates to the seller, "whereupon" the seller obtains the stated rights and obligations in and to the collateral. An additional act was required, namely the borrower defaulting on the loan, followed by the escrow agent's delivery of the stock to the seller before any rights attached to the collateral. This is not the case in this instant proceeding. The Conditional Assignment states, "BORROWER hereby assigns to KTO all proceeds of existing or future contracts, accounts receivables and other intangibles owned by the debtor". The Conditional Assignment also states, "[n]o further act on the part of BORROWER shall be necessary to assign all of its right, title and interest in and to future contracts, accounts receivable ...". Although, the Conditional Assignment states the "assignment is deemed conditional until a default by BORROWER", this language does not serve to postpone KTO's attachment of its interest in the accounts receivable. In *Allegaert v. Chemical Bank*, 657 F.2d 495

(2d Cir.1980), the Court of Appeals held that the language of UCC § 9–203[2] requires an explicit statement of any intent to postpone attachment. *Allegaert,* 657 F.2d at 506. In that case the court stated,

> If the restrictive provisions had not been so modified, the PA [Purchase Agreement] would have been rendered meaningless, for it would have created a "security interest" which attaches only after default, totally destroying the value of the pledge [footnote omitted]. Paragraph 2 of the PA, which the district court pointed to as indicating that Chemical Bank was to become a secured creditor only after an event of default, did not govern the creation of the security interest—it merely governed the disposition of the proceeds of the collateral, an aspect of Walston's and Chemical Bank's debtor-creditor relationship that was entirely separate from the creation of the security interest. Paragraph 2 simply concerned the parties' rights in the proceeds of the DGF Debenture, not the attachment of Chemical Bank's interest in the Debenture.

*Allegaert,* 657 F.2d at 506. The *Allegaert* court distinguishes *In re Dolly Madison,* stating,

> There is no "whereupon" clause in the PA explicitly postponing attachment. And the PA is not completely silent as to the time when Chemical Bank becomes a secured creditor, for Paragraph 1 clearly states that a security interest is being created and immediately granted to Chemical Bank. As such, the delayed attachment language of *Dolly Madison* is inapplicable to the instant PA, as is the complete silence situation of *Copeland.* In short, the Chemical Bank–Walston PA provided for immediate attachment more clearly than either the *Copeland* or *Dolly Madison* agreements.

*Allegaert,* 657 F.2d at 505. Such is the case in this action. The terms of the Conditional Assignment served immediately to create KTO's security interest in the accounts receivable and other intangibles.

Although, KTO's right to enforce its security interest in the collateral could only be exercised upon default, this conditional enforcement right did not serve to postpone KTO's security interest in this right.

In any event, this court held in an earlier decision that the "debtor defaulted on this note when it failed to make the first payment of $500,000 which was due on April 11, 1985". *In re McCorhill Publishing, Inc.,* 73 B.R. at 1015. Therefore, if KTO's interest had not attached to the collateral described in the Conditional Assignment prior to the debtor's default, it would have attached on April 11, 1985. Attachment at a later date would not affect KTO's priority status based upon its perfection of the security interest which it attained by filing pursuant to UCC § 9–401. UCC § 9–312 governs priorities among conflicting security interests in the same collateral. This section states:

> (5) In all cases not governed by other rules stated in this section ..., priority between conflicting security interests in the same collateral shall be determined according to the following rules:
>
> (a) Conflicting security interests rank according to priority in time of filing or perfection. *Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected whichever is earlier,* provided that there is no period thereafter when there is neither filing nor perfection.
>
> (b) So long as conflicting security interests are unperfected, the first to attach has priority. (emphasis added).

KTO's security interest was properly perfected by filing pursuant to UCC § 9–401. If KTO's security interest attached in April 1985, as a result of the debtor's default, this would not affect the priority KTO attained by filing in 1984 pursuant to 9–213(5)(a). This statute is a "pure race" statute and provides that where two or more security interests have

---

**2.** This case was decided under UCC § 9–204(1). This provision has been recodified in New York as N.Y.U.C.C. § 9–203.

been perfected by filing, priority in the same collateral is determined in the order of filing, regardless of which security interest is perfected first and whether it attached before or after the filing. *Credit Alliance Corporation v. Jebco Coal Company, Inc.*, 688 F.2d 10, 13 (3rd Cir.1982); *See Aircraft Trading And Services, Inc. v. Braniff, Inc.*, 819 F.2d 1227 (2d Cir.1987); *In re Simponville Mills, Inc.*, No. 87 B 11428 (Bankr.S.D.N.Y. December 18, 1987); White and Summers, *Handbook of Law Under the Uniform Commercial Code* § 25–4 at 1036–1039 (2d. ed. West 1980).

The trustee disputes this court's finding that the debtor defaulted on the note and argues KTO has no rights against the collateral because there has been no default by the debtor. The trustee asserts various issues have been raised in the state court proceeding which would support the proposition that the failure of the debtor to pay was excusable. No evidence was offered by the trustee to substantiate this assertion. KTO has obtained relief from the automatic stay by order of this court. The trustee could have pursued this action in state court, yet chose this forum to pursue its claims against KTO. Insofar as the earlier decision by this court finding a default by the debtor is law of the case, and, in light of the lack of evidence offered to the contrary on the issue of the debtor's default of this note, the debtor's default as of April 11, 1985 is an established fact.

### Usury and SFC

11 U.S.C. § 558 provides:

The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes

of frauds, usury, and other personal defenses.

Both the trustee and KTO seek a determination by this court that the terms of SFC's loan are usurious and void under New York or New Jersey law. It is argued by both KTO and the trustee that New York choice of law principles are applicable under *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), which declares a federal court must apply conflict of laws rules prevailing in the states in which they sit.[3]

SFC argues there is no disputed choice of law issue because the promissory note has a choice of law provision. It is argued that because one of the terms on the face of the promissory note stated "[a]fter default, interest shall accrue cumulatively at the highest legal rate under the laws of N.J. [New Jersey]", New Jersey law is the applicable law to interpret the terms of the promissory note.

 The terms of the promissory note which state the maximum New Jersey rate of interest is the interest to be charged the debtor on the note is not a choice of law provision. The note does not state that the terms of the note will be governed by New Jersey Law, it merely states that the standard for determining the interest on the loan is set by whatever happened to be the maximum rate of interest in New Jersey at the time of default. Therefore, there is no choice of law provision governing this note. Regardless of whether New York or New Jersey law is applied to the terms of this note, both states prohibit a corporation from raising the defense of civil usury. New York General Obligations Law

---

**3.** It has also been asserted that the debtor did not own the collateral at the time it granted SFC a security interest in the collateral and therefore SFC's security interest is void. The closing with SFC was November 27, 1984. However, the closing with KTO, at which time KTO transferred the collateral to the debtor, was on November 30, 1984. Tucker testified that the debtor represented that it owned the Millwood property and that he was given an extensive tour of the premises accompanied by Canhill and Cohen. (Transcript of Trial, at 134). The fact that the debtor may not have had rights in the collateral at the closing with SFC does not negate the fact

that SFC filed first pursuant to UCC § 9–312(5) which, as has been stated in this decision, is a pure race statute. The SFC Security Agreement warrantied that the debtor owned the Millwood property. Furthermore, as with KTO, even if the rights of SFC did not attach to the collateral until November 30, 1984, when the debtor had rights in the collateral (*See* N.Y.UCC § 9–203(1)(c)), this would not affect the fact that SFC perfected its interest in the collateral by filing pursuant to N.Y. UCC § 9–312(5). *See In re Pitman*, 843 F.2d 235, (CCH) Bankr.L.Rep. ¶ 72,240 at 92,761 (6th Cir.1988).

§ 5–521; N.J.S.A. 31:1–1, 1–6; *See In re McFarlin's, Inc.*, 49 B.R. 550 (Bankr.W.D.N.Y.1985); *Ferdon v. Zarriello Bros., Inc.*, 87 N.J.Super 124, 208 A.2d 186 (S.Ct.1965). However, loans to corporations are not exempt from criminal usury provisions of the New York Penal Law, § 190.40 and the New Jersey Code of Criminal Justice, § 2C:21–19; *See* New York General Obligations Law § 5–521(3). *In re Carla Leather, Inc.*, 44 B.R. 457 (Bankr.S.D.N.Y. 1984) *affd* 50 B.R. 764 (S.D.N.Y.1985); *In re McFarlin's, Inc*, 49 B.R. 550. A person has committed criminal usury in New York if the interest rate on the loan to a corporation exceeds an annual rate of 25% or an equivalent rate for a longer or shorter period. In New Jersey, for a person to be culpable under the criminal usury statute, the annual interest rate charged on a loan to a corporation must exceed 50% or the equivalent rate for a longer or shorter period. N.J.Code of Criminal Justice § 2C:21–19 subd. a(2). Under New Jersey Law, SFC's loan to the debtor at an annual rate of interest of 48% would not be criminally usurious. However, such a loan would be criminally usurious and, therefore, void under New York law. Accordingly, for a resolution of this matter, this court must determine whether New York or New Jersey Law is applicable in this proceeding.

■ A bankruptcy court in a core matter is not bound, as a court sitting in a diversity case, by the choice of law of the forum. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 239–40, 91 L.Ed. 162 (1946) *reh. denied* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947). Thus, this court must apply the federal common law choice of law rule in order to determine the consequences resulting from the loan agreement between SFC and the debtor. *Aaron Ferer & Sons, Ltd v. Chase Manhattan Bank*, 731 F.2d 112, 121 (2d Cir.1984); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980) *cert. denied* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *In re Perret*, 67 B.R. 757 (Bankr.N.D.N.Y.1986). Both the *Ferer* court and this court, in the *Perret* case, used a signif-

icant relationship test to determine which law should apply. This position is supported by Restatement, (Second) Conflict of Law § 203 (1971), which declares:

§ 203. Usury

The validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in *a state to which the contract has a substantial relationship* and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188. (emphasis added).

§ 188 of the *Restatement, (Second) Conflicts of Laws* § 188 (1971) states, in relevant part,

(2) In absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–99 and 203.

■ Accordingly, this court must first determine which state's choice of law rules must be applied. This issue is resolved by determining as to which state the contract has the most significant or substantial relationship. The most significant factor which determines whether a contract has a substantial relationship to a state is the place of contracting. In this case there is conflicting evidence as to where the contract was made. Tucker testified that the check for $200,000 was delivered to a rep-

resentative of the debtor at his home in New Jersey. This testimony was not rebutted by any evidence submitted by the trustee or KTO. Tucker also testified that all the documents that were executed were signed on the closing date at his office or Newark Airport which are both located in New Jersey. However, the letter dated November 27, 1984, signed and delivered by McPhillips on the day of the closing, states that the security agreement, the UCC–1 financing statements, the promissory note, the Affidavit of Title, the Origination Agreement and the Secretary's Certificate were "duly executed". Ex. 25. Because most of these documents are either not dated, dated November 26, 1984 or have typed dates changed by hand to November 27, 1984, this court believes that it is questionable whether these documents were executed by the debtor's representatives in New Jersey, or executed in New York and then delivered by McPhillips to New Jersey. None of these documents, including the cashier's check given to the debtor, was signed by Tucker. In fact, even if the promissory note, the security agreement and all the other documents had not been delivered to New Jersey, the debtor would have been liable under these agreements because it signed them and is the party to be charged. Unlike negotiable instruments, delivery of these documents to New Jersey was not necessary to their efficacy. As far as other contacts with New York, the contract, as admitted in Tucker's testimony, was negotiated in New York, the contract is to be performed in New York because repayment of the loan is to take place in New York, the location of the collateral is in New York and the debtor and its representatives live in New York. New Jersey has very few contacts with the contract, which do not rise to the level of demonstrating the contract's significant relationship with that state. Once again, it is questionable whether the contract was executed in New Jersey, albeit, the check was given to the debtor's representative in New Jersey and SFC office and its attorney's office is located in New Jersey.

sey. Based on the facts in this case, New York has the most "significant" or "substantial" relationship or contacts with the contract. Therefore, New York's choice of law rules must apply to the terms of the SFC loan.

■ In accordance with New York choice of law rules applicable to contract actions, courts will apply the law of the state which has the most significant relationship to the transaction and the transaction and the parties. *Speare v. Consolidated Assets Corporation,* 367 F.2d 208 (2d Cir.1966); *Camrex Contractors v. Reliance Marine Applicators,* 579 F.Supp. 1420 (E.D.N.Y. 1984); *Kristinus v. H. Stern Com. E. Ind. S.A.,* 463 F.Supp. 1263 (S.D.N.Y.1979); *G.A. Thompson & Co. v. Wendell J. Miller Mortgage Co.,* 457 F.Supp 996, 998 n. 2 (S.D.N.Y.1978). Based upon the facts in this case, New York has the most substantial and significant contacts with the contract between the debtor and SFC.[4] Additionally, New York's maximum rate of interest of 25% is half of New Jersey's permissable interest rate. New York has a strong public policy against interest rates which exceed 25%, which policy must be enforced. *North American Bank, Ltd. v. Schulman,* 123 Misc.2d 516, 474 N.Y.S.2d 383 (1984). Accordingly, New York's usury laws are applicable to the terms of the SFC promissory note.

On its face, the promissory note states that no interest would be charged for the term of the loan but that upon default interest would accrue at 4% per month for an annual total of 48% interest on the principle. Although "[a]bundant authority exists in New York for the holding that there is no usury where an excessive rate of interest is made payable after maturity", this court finds that interest was charged for the duration of this note. *American Express Co. v. Brown,* 392 F.Supp. 235 (S.D.N.Y.1975) *citing Heelan v. Security National Bank,* 73 Misc.2d 1004, 343 N.Y. S.2d 417, 421 (Dist.Ct. Suffolk Co. 1973). Even though the face of the promissory states no interest would accrue during the

---

**4.** Under New Jersey conflict of law rules it is also likely New York law would govern this

loan agreement. *See Lesser v. Strubbe,* 67 N.J. Super. 537, 171 A.2d 114 (1961).

duration of the loan, Tucker testified he received a $4,000.00 "charge" paid by the debtor for the use of the $200,000 for approximately 2 weeks. Moreover, the Secretary's Certificate, one of the documents executed by the debtor for the closing, stated the terms and conditions upon which the debtor would borrow the $200,000, one of which declaring "[i]nterest shall be charged at a flat rate of Four Thousand ($4,000) Dollars". Ex. 19. Additionally, the records kept by SFC which reflect entries of payments on the debtor's loan indicate that the $4,000.00 payment recorded on November 27, 1984 was determined by using a 4% monthly interest rate. Ex. 21.

This court finds that the interest rate charged by SFC on its loan to the debtor is usurious. With regard to usurious intent, nothing more is needed than an intent to take and receive a rate of interest in excess of that allowed by law. *In re Rosner*, 48 B.R. 538 (E.D.N.Y.1985); *Hammond v. Marrano*, 88 A.D.2d 758, 451 N.Y. S.2d 484 (1983); N.Y. Penal Law § 190.40. This court finds that where a court deems a transaction involving a lender other than a bank or savings and loan association to be usurious, the court must declare the transaction and its supporting documents void and order that all documents and collateral be cancelled and surrendered. *In re Rosner*, 48 B.R. at 561; *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 499 N.Y.S.2d 650, 654–56, 490 N.E.2d 517, 520–22 (Ct.App.1986) N.Y. Penal Law § 190.40; N.Y. General Obligations Law § 5–511. The SFC loan is void and SFC is not entitled to retain its lien on the collateral. Additionally, SFC is not entitled to receive any further interest payments or the balance of the principle owed. *In re Rosner*, 48 B.R. at 561 ("At the present time this Court is deciding no more than that in September 1981 when Mrs. Rosner gave a third mortgage on her house to secure the loan from KB to Side–by–Side, that loan was usurious because the rate of interest being charged for it by KB exceeded the 25% ceiling imposed under the Penal Law. Accordingly, KB is no more entitled than is ESIC to have the proceeds from the sale of Mrs. Rosner's house turned over to it pursuant to its mortgage.

Those proceeds must remain in Mrs. Ro estate for distribution to her general creditors"); *Szerdahelyi v. Harris*, 499 N.Y.S. 2d at 656, 490 N.E.2d at 522–23. SFC has already received interest payments in the amount of $56,000 and a $50,000 payment on the principal. Because the amount of interest paid to SFC would not exceed the legal annual rate of interest (25% x 200,000 = $50,000) which has accrued from the date of the closing on the note, November 27, 1984, to the date the debtor filed its bankruptcy petition, March 12, 1987, SFC is entitled to keep the interest paid by the debtor in the amount of $56,000. ($50,000 divided by 12 months = $4166.67 x 51 months = 212,500.17). *Szerdahelyi v. Harris*, 499 N.Y.S.2d 650, 655–56, 490 N.E.2d 517, 522–23 (Ct.App.1986) ("The 'present judicial interpretation' the amendment intended to reflect was the interpretation we affirmed in *Curtiss v. Teller*, 157 A.D. 804, 143 N.Y.S. 188, *affd* 217 N.Y. 649, *supra*, namely, that a usurious transaction is void *ab initio*, and a return of excess interest cannot save to the lender the money actually advanced or the interest due on the loan (*see, id.*, p. 817, 143 N.Y.S. 188). Consequently, although defendants need not return the lawful interest plaintiff has already paid, they cannot recover either the money loaned or the interest remaining due in this transaction"). However, the $50,000 paid by the debtor on the principal must be returned by SFC to the trustee to be placed in the debtor's estate.

### Preservation of Liens

The trustee seeks to preserve the voided or unperfected liens of KTO and SFC for the benefit of the estate pursuant to 11 U.S.C. § 551. In light of this court's finding that KTO's lien on the debtor's accounts receivable had attached and was properly perfected by the filing pursuant to Article 9 of the UCC, the trustee may not avoid this lien. As to SFC's loan, this court has determined that this loan is usurious. Therefore, the loan and its supporting documents, including the SFC security agreement with the debtor which grants to SFC

a security interest in the debtor's equipment, accounts receivable, inventory and personalty, are void and without effect. GNYSB was never entitled to file a UCC–1 as to the debtor's inventory. The trustee, in avoiding a creditor's security interest, steps into the creditor's shoes and only obtains those rights which the creditor retains. *Connelly v. Marine Midland Bank, N.A.,* 61 B.R. 748, 750. Section 551 provides no basis for the promotion of the avoided lien or judgment to an exalted position. *See In re Kors, Inc.,* 819 F.2d 19 (2d Cir.1987); *In re Appalachian Energy Industries, Inc.,* 25 B.R. 515 (M.D.Tenn. 1982); J. Chobot, *Preserving Liens Avoided in Bankruptcy—Limitations and Applications,* 62 Am.Bankr.L.J. 149 (1988). Because SFC's loan and security interest in the debtor's property are void and GNYSB never acquired a security interest in the debtor's inventory, the creditor retains no rights or interests for the trustee to preserve for the debtor's estate.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(K).

2. KTO's lien on the debtor's accounts receivable was properly perfected and filed and is a valid lien on the debtor's property.

3. GNYSB has conceded that, by the terms of its security agreement entered into with the debtor, it is not entitled to a lien on the debtor's inventory.

4. SFC's loan is governed by, and is usurious, under applicable New York Law. Accordingly, SFC is not entitled to repayment of the principal or interest on the loan and its security agreement and security interest are void as to the debtor's inventory, equipment, accounts receivable and personalty.

5. SFC may retain the $56,000 of interest paid on the loan by the debtor, however, SFC must return the $50,000 payment made by the debtor on the principal.

6. The trustee may not avoid KTO's security interest or preserve for the benefit of the debtor's estate SFC's security interest.

7. KTO is the first lienholder on the debtor's accounts receivable and furniture.

8. It is obvious from the filing numbers, that GNYSB and KTO filed their UCC–1s in Westchester County and the New York Secretary of State at the same time of day, if not by the same person. Accordingly, GNYSB and KTO share secured interests as first lienholders on the debtor's fixtures, inventory, equipment and personalty, to the extent of their claims. GNYSB's interest in these assets is limited to those assets covered by the real property mortgage on the Millwood premises.

9. Cititrust has a second lien on the debtor's inventory and accounts receivable.

10. These liens and the priority accorded to them by this court are subject to all other valid liens and encumbrances on the debtor's property which are not the subject of this proceeding.

SETTLE ORDER on notice in accordance with the above findings of fact and conclusions of law.