**In re McCORHILL PUBLISHING, INC., Debtor.**

**In re NEW CASTLE ASSOCIATES, Debtor.**

**KRAUS–THOMSON ORGANIZATION, LTD., Plaintiff,**

v.

**McCORHILL PUBLISHING, INC., Debtor, Harvey S. Barr, as Trustee for McCorhill Publishing, Inc., and New Castle Associates, Defendants.**

**Bankruptcy Nos. 87 B 20104, 88 B 20122. No. 88 ADV. 6061.**

United States Bankruptcy Court, S.D. New York.

Oct. 18, 1988.

See also, D.C., 91 B.R. 223.

Bleakley Platt & Schmidt, McCarthy, Fingar, Donovan, Drazen & Smith, White Plains, N.Y., for McCorhill Pub., Inc.

Ernest H. Hammer, New York City, for New Castle Associates.

Kissam & Halpin, Hahn & Hessen, New York City, for plaintiff.

Harvey S. Barr, Spring Valley, N.Y., trustee.

### DECISION ON COMPLAINT SEEKING ORDER FOR DECLARATORY JUDGMENT

HOWARD SCHWARTZBERG, Bankruptcy Judge.

This is an adversary proceeding pursuant to Bankruptcy Rule 7001(2), (9) commenced by Kraus Thomson Organization Ltd. ("KTO"), a Liechtenstein corporation qualified to do business in New York, to obtain a declaratory judgment fixing the amount of its liens against real estate occupied by the debtor, McCorhill Publishing, Inc. ("McCorhill") which it previously transferred to a related debtor, New Castle Associates ("New Castle"). KTO also seeks to fix the amount of its liens against McCorhill's inventory and accounts receivable. The Chapter 11 trustee of McCorhill, who was appointed by this court pursuant to 11 U.S.C. § 1104 and in accordance with this court's ruling on June 29, 1987, *In re McCorhill Publishing, Inc.*, 73 B.R. 1013 (Bankr.S.D.N.Y.1987), previously disputed the validity and priority of various liens against the McCorhill's assets. One of the trustee's contentions was that a prepetition event of default had not occurred to trigger KTO's secured claim and that McCorhill's conditional assignment of a secured interest to KTO did not give rise to a valid prepetition lien. In ruling on the priority of various liens claimed against McCorhill's assets, this court held, among other things, that McCorhill's default as of April 11,

1985, was an established fact and that KTO was the first lienholder on the debtor's accounts receivable and held a valid lien on the debtor's property. *In re McCorhill Publishing, Inc.*, 86 B.R. 783 (Bankr.S.D. N.Y.1988). The precise amount of the lien was not determined.

Although this court previously granted KTO's request for relief from the automatic stay so that KTO could proceed in the state court to foreclose its lien on the mortgage covering the real estate occupied by McCorhill which McCorhill had transferred to the related debtor, New Castle, KTO chose instead to commence this adversary proceeding to determine the amount of its secured claim against the debtors.

The McCorhill Chapter 11 trustee filed an answer containing denials, six affirmative defenses and seven counterclaims. The affirmative defenses asserted that: (1) KTO failed to deliver certain items contemplated by the purchase agreement; (2) KTO misrepresented the value of certain property sold to McCorhill; (3) KTO violated a covenant not to compete; (4) KTO failed to deliver certain reprint contracts; (5) McCorhill is entitled to a credit for receivables collected by KTO and (6) KTO is not entitled to costs and attorneys' fees. The trustee's counterclaims alleged that: (1) KTO assigned unassignable reprint contracts to McCorhill; (2) KTO failed to convey its interest in reprint contracts; (3) McCorhill is entitled to set off the amount of the reprint contracts as against McCorhill's obligation to KTO; (4) KTO's officers diverted inventory which KTO sold to McCorhill; (5) KTO's diversion of inventory defrauded McCorhill; (6) KTO's principal director, Hans Peter Kraus, is engaged in a business in competition with McCorhill in violation of the purchase agreement between KTO and McCorhill and (7) KTO received payments from McCorhill's customers and has converted these funds.

The debtor and New Castle also filed answers containing affirmative defenses and counterclaims which were similar to the trustee's allegations. McCorhill was allowed to file an answer, notwithstanding the Chapter 11 trustee's answer

because McCorhill alleged that if successful a surplus would be obtained for its benefit in excess of the allowed claims of creditors.

McCorhill's answer contained nine counterclaims which were also adopted by New Castle in its answer and which alleged: (1) The reprint contracts which McCorhill purchased from KTO were unassignable by KTO and will not be honored by the licensors of the materials intended to be reprinted; (2) McCorhill was damaged to the extent of $3 million by receiving unassignable reprint contracts which meant that there was no consideration received for the purchase note which McCorhill issued to KTO; (3) McCorhill is entitled to a $3 million offset; (4) KTO's officers diverted inventory purchased by McCorhill for use in one of KTO's West German subsidiaries; (5) The diversion of inventory defrauded McCorhill; (6) KTO misrepresented that the employees at the division purchased by McCorhill were not members of pension, profit sharing, severance or termination pay obligation, retirement or stock purchase plans covering such employees; (7) For a number of years preceding McCorhill's purchase of the reprint and periodicals business from KTO, the latter's officers and employees were engaged in systematic larceny of KTO's inventory which was not disclosed to McCorhill; (8) KTO's principal shareholder, Hans Peter Kraus, under the name of H.P. Kraus, Inc. continues to be engaged in antiquarian book purchasing or sales in violation of KTO's covenant not to compete with the business which McCorhill purchased from KTO and (9) KTO has wrongfully converted payments received from McCorhill's customers which were forwarded to KTO.

## FACTS

1. On March 12, 1987, McCorhill filed with this court a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

2. On June 29, 1987, this court ruled that a Chapter 11 trustee should be appointed pursuant to 11 U.S.C. § 1104 be-

cause of the gross mismanagement of McCorhill's business affairs.

3. On December 3, 1987, New Castle filed with this court a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code and continued as a debtor in possession in accordance with 11 U.S.C. § 1107. New Castle is related to McCorhill in that the same limited partners, including Cahill and Cohen, are officers, directors and shareholders of McCorhill. Both New Castle and McCorhill maintain the same principal office, located at 19 West 36th Street, New York, New York.

4. Pursuant to a written agreement of sale entered into on March 23, 1984, as amended, KTO agreed to sell to McCorhill certain real property and improvements located in Millwood, New York (the "Millwood property") and substantially all of the assets of two divisions owned by KTO known as Kraus Reprint and Kraus Periodicals operated in Millwood, New York, for a total purchase price of $7,750,000. The closing was scheduled for July 23, 1987. On June 29, 1987, an amendment of the agreement was entered into whereby McCorhill would take over the operations of the two divisions, to be known as Kraus Reprints and Kraus Periodicals, on July 1, 1987, with a closing to take place on September 30, 1987. During this interim period until the closing in September, McCorhill took over the operations of the two divisions for its own account. KTO agreed to pay the salaries of the KTO employees in Millwood who would then be employed by McCorhill, which agreed to make additional deposits of $500,000 and $200,000, and to reimburse KTO for the salaries paid by KTO through July of 1984.

5. By letter agreement dated October 1, 1984, McCorhill acknowledged its default under the agreement and agreed to make additional deposits of $150,000 and $60,000. A closing was ultimately held on November 30, 1984, at which time KTO executed and delivered to McCorhill all documents necessary to sell the real estate and other assets in accordance with the agreement, as modified.

6. A portion of the property conveyed by KTO to McCorhill consisted of all licensing agreements of KTO relating to the antiquarian or periodicals division and the reprint division. Section 8 of the purchase agreement contained a provision that KTO had full power and authority to convey and assign the property referred to in the agreement. Included in this property were approximately 3000 reprint contracts with licensors who authorized KTO to reprint their books, periodicals and manuscripts. However, each reprint contract which KTO conveyed to McCorhill contained the following language:

Kraus shall not assign, transfer or encumber the rights hereby granted in any manner *except to a successor or affiliated corporation.* No such assignment shall relieve Kraus of its liability to the licensor hereof.

(Emphasis added).

7. McCorhill alleges that it is neither a successor nor an affiliated corporation with respect to KTO and that KTO did not obtain any consents to the transfer of the reprint contracts from any of its licensors, with the result that McCorhill suffers the risk that the reprint contracts will not be honored by the licensors and will therefore be compelled to negotiate the reprint contracts or perhaps lose them through cancellations. There was no evidence that any reprint contract was cancelled or that any licensor interfered with McCorhill's attempt to exercise rights with materials subject to the reprint contracts for the reason that McCorhill was not a successor corporation within the meaning of the restriction on assignments contained in the reprint contracts transferred to McCorhill by KTO. Only one licensor, the Early English Text Society, objected to a new reprint contract which McCorhill proposed because the royalty terms were less favorable than those under the existing reprint contract.

8. After the signing of the original agreement on March 23, 1984, McCorhill's president, Herbert Cohen, its accountant, Mr. Rubin, and another representative, Mr. Brown, were given free access to all of the records, mail and information pertaining to

KTO's Kraus Reprints and Kraus Periodicals divisions in Millwood, New York. They were given an office at the Millwood property which they used about four times per week. On June 27, McCorhill assumed full responsibility for the operations of these two divisions, notwithstanding that the formal closing did not take place until November 30, 1987.

9. McCorhill paid KTO $5,000,000 at the closing and executed a promissory note in favor of KTO in the principal amount of $2,750,000, bearing interest at the rate of 9% per annum from June 21, 1984.

10. As security for the note, McCorhill executed and delivered to KTO a mortgage covering the Millwood real property and a security agreement granting KTO a purchase money security interest in McCorhill's assets, including accounts receivable, inventory, machinery and equipment, intangibles and the proceeds from these items. KTO properly perfected the security agreement and the mortgage. The mortgage is subject and subordinate only to the mortgage, dated November 30, 1984, given by McCorhill for the benefit of the Greater New York Savings Bank.

11. On December 31, 1984, McCorhill transferred the Millwood real property to New Castle by a bargain and sale deed that was recorded on May 31, 1985.

12. The court has previously found that KTO holds a validly perfected security interest in substantially all of the property of McCorhill to the extent of its claim and that McCorhill defaulted on the note obligations as of April 11, 1985. *In re McCorhill Publishing, Inc.*, 86 B.R. 783 (Bankr.S. D.N.Y.1988).

13. In view of the fact that under the purchase agreement McCorhill had the right to continue to use the name "Kraus" in connection with the Kraus Reprints division and the Kraus Periodicals division which McCorhill acquired from KTO, some customers of these divisions confused by the name "Kraus", forwarded payments on their accounts to KTO instead of directing the payments to McCorhill. The trustee learned of these payments after he took over McCorhill's operations. When KTO received an incorrect payment it would notify McCorhill's treasurer, David Patrick, as to the amount and would credit McCorhill for the payment which KTO held in an account known as the Exchange Account, pursuant to its lien on McCorhill's receivables. When the Chapter 11 trustee learned of these payments he entered into an agreement with KTO whereby KTO transmitted to the trustee all checks received which were intended for McCorhill after September of 1987. KTO continues to hold checks received prior to September of 1987, which now totals $73,260.27.

14. In April of 1984, Mr. Guenther Sprunkel, a former resident of West Germany, was a vice president of KTO in charge of its reprint and antiquarian (periodicals) divisions. Sprunkel's hopes of becoming president of KTO's reprint and antiquarian divisions located in Millwood, New York were dashed when he learned that KTO had agreed on March 23, 1984, to sell these divisions to McCorhill and that Herbert Cohen was to become president of the new entity. Although the sale did not formally close until November 30, 1984, McCorhill's president, Herbert Cohen, was given an office and complete access to the records and employees for these divisions of the Millwood plant in April of 1984. Cohen formally took over control of the operations of the Millwood facility on June 27, 1984. Accordingly, when Sprunkel informed KTO that he was going back to West Germany and that he wanted to purchase inventory from KTO for a business in West Germany, KTO's executive vice president, A. Bernard Tager, advised Sprunkel to deal with Cohen.

15. Pursuant to a handwritten memorandum from Cohen to Sprunkel and McCorhill's treasurer Dennis Patrick (who was then still employed by KTO), KTO agreed to sell 3153 periodical volumes to Sprunkel for $18,000. [Exhibit ¶ 6] Additionally, KTO agreed to sell all its interest in its subsidiary in Weisbaden, West Germany, known as Saendig, for one West German mark. The liabilities of Saendig then exceeded its assets. Because of the negative net worth of Saendig, the sale to

Sprunkel was advantageous to KTO because Sprunkel agreed to assume all Saendig's obligations to Iranian Universities, which formed a substantial portion of Saendig's liabilities. [Exhibit # 7]

16. The foregoing sales from KTO to Sprunkel of periodicals for $13,000, reprints in excess of $90,000 and the Weisbaden business called Saendig, were with McCorhill's consent and knowledge, especially since McCorhill's president, Herbert Cohen, handled the transactions. However, what was not known to KTO and McCorhill, was that Sprunkel also agreed in June of 1984 to purchase from Anthony Mitura two volumes of a periodical known as Burlington Magazine, for approximately $3,500. The volumes were then worth between $10,000 and $12,000. Anthony Mitura was then a KTO operations manager at the Millwood plant who worked under the direction of McCorhill's president, Herbert Cohen, after Cohen was installed at the Millwood plant in April of 1984.

17. Anthony Mitura was not authorized by anyone to sell the two sets of Burlington Magazines from KTO's inventory nor did he have any color of title to sell the sets to Sprunkel, who should have known that Mitura did not own the volumes. Either Sprunkel paid Mitura to steal the volumes or Mitura took them with the understanding that he could then sell the sets to Sprunkel. This defalcation came to light the following year when another McCorhill employee, Michael McPhilips, informed Cohen in March of 1985 that Sprunkel and Mitura were involved in misappropriating inventory. The two sets of Burlington magazines were shipped to Sprunkel in West Germany in a sea case along with the other items that Sprunkel had legitimately negotiated with Cohen to purchase for his own account. Sprunkel paid Mitura $1,500 in cash for the first Burlington set. According to Sprunkel's deposition, he conveniently had $1,500 in cash in his pocket at the time. Sprunkel also paid Mitura $2,000 in cash for the second set.

18. There was no evidence that any other items were misappropriated from KTO's inventory by any other KTO employees or that any other KTO employees were engaged in systematically looting KTO's inventory. Moreover, there was no evidence that KTO knew, or should have known that Mitura and Sprunkel had misappropriated the sets of Burlington Magazines from KTO's inventory.

19. In the Spring of 1983, when McCorhill's representatives negotiated with KTO to purchase KTO's reprint and periodicals divisions, the family of Hans Peter Kraus then owned 49.4% of KTO. Hans Peter Kraus was one of the founders of KTO and its chairman of the board of directors. The Kraus family also owned a separate entity known as H.P. Kraus Old and Rare Books ("H.P. Kraus"). H.P. Kraus does not sell reprints or periodicals in sets as does KTO. H.P. Kraus sells rare books and individual items of intrinsic value as objects of art and not complete sets. KTO's business is mainly with colleges, universities and libraries, for the sale of reprints to replace damaged or lost books. H.P. Kraus does not compete in the same marketplace with KTO. When KTO, as seller, entered into the agreement with McCorhill on March 23, 1984 H.P. Kraus was not a subsidiary of KTO or a part of KTO's business enterprise. KTO did not, nor does it now, have any proprietary interest in H.P. Kraus.

20. Section 12 of the March 23, 1984 agreement of sale and purchase provides as follows:

Section 12. *Restrictive Covenant*

(a) The Seller shall not establish, engage in, or in any manner become interested in, directly or indirectly, as an owner, partner, agent, shareholder, or otherwise, any reprint publishing or reprint or antiquarian purchasing or sale business in competition with Buyer within the geographic areas in which Seller previously operated for a period of 5 years from the Closing Date. The Buyer shall have the right to assign this restrictive covenant. Because the breach or anticipated breach of this restrictive covenant will result in immediate and irreparable injury to the Buyer for which Buyer will not have an adequate remedy at law, Seller agrees that the Buyer shall be entitled to sue in

equity to enjoin such breach or anticipated breach and to seek any and all legal and equitable remedies to which the Buyer may be entitled.

(b) It is specifically understood and agreed that Seller shall not be prohibited from engaging in the business conducted by Bernan Associates, Worldwide Books, Kraus International Publications, HMSO, Bettman and UPI, as presently conducted.

(c) The provisions of this Section 12 shall survive the Closing.

21. Not only is H.P. Kraus not engaged in the reprint publishing or reprint antiquarian purchasing or sale business in competition with McCorhill, but the representatives of KTO had no authority to prohibit or restrict the independent entity known as H.P. Kraus from engaging in such business when they entered into the agreement with McCorhill. There was no evidence that when KTO and McCorhill executed the March 23, 1984 agreement of sale, either KTO or McCorhill intended or contemplated that KTO would be liable to McCorhill for breach of a restrictive covenant if the Kraus family did not terminate their separate entity known as H.P. Kraus, and cease doing business in the sale of old and rare books.

22. There was no evidence of any representations on the part of KTO prior to, or in the March 23, 1984 agreement of sale, that KTO's employees of the divisions purchased by McCorhill were not members of pension sharing, severance or termination pay obligation, retirement or stock purchase plans covering such employees. Indeed, there was no credible evidence as to those issues at all, either positive or negative.

23. KTO has established that it holds a first lien on McCorhill's inventory and accounts receivable and a junior lien on the real estate which McCorhill transferred to New Castle. The affirmative defenses and counterclaims asserted by McCorhill and its Chapter 11 trustee do not support a reduction in KTO's claim, except to the extent of the Exchange Account balance of $73,-260.27, representing checks received by KTO for payments intended for the Kraus Reprint and Kraus Periodicals divisions of McCorhill. Therefore, KTO has established that McCorhill has defaulted on its promissory note in the principal amount of $2,750,000, with interest at the rate of 9 per cent per annum, and that the principal and interest due in mid October of this year was $3,473,112, less a $73,260.27 credit from the Exchange Account, for a net indebtedness of $3,399,851.73.

## DISCUSSION

McCorhill seeks a determination that KTO breached the sales contract between the parties, alleging misappropriation of monies by KTO belonging to McCorhill, misappropriation of inventory by a KTO employee, a defective assignment of the reprint contracts from KTO to McCorhill and the violation of the restrictive covenant by Hans Peter Kraus, a 49.4% shareholder of KTO. If this court finds that any of McCorhill's or the trustee's affirmative defenses or counterclaims are sustained, McCorhill then seeks to expunge KTO's claim pursuant to 11 U.S.C. § 502, or to subordinate this debt in accordance with the terms of 11 U.S.C. § 510.

### (a) *The Exchange Accounts*

McCorhill asserts that the checks sent to KTO for payment of accounts receivable of Kraus Reprint and Kraus Periodical, after McCorhill purchased this company, were improperly retained by KTO in its Exchange Account. This Exchange Account was opened by KTO specifically as a haven for which monies rightfully belonging to McCorhill may be accounted. Mr. Tager, KTO's vice president, testified that details of this accounting were sent to McCorhill on a daily basis. Similarly, McCorhill frequently received monies which were in payment of KTO accounts and an Exchange Account was also utilized by McCorhill to account for and keep separate these monies. Mr. Tager testified that all monies in the Exchange Account which accrued from June 1984 and November 1984 were paid to McCorhill a short time after November 30, 1984, the date of the closing of the sale. Mr. Tager stated that monies have accrued

since early 1985 and that there is a present balance owed to McCorhill in the amount of $73,260.27.

Neither party disputes that KTO's possession of the money owed to McCorhill came about accidentally and unintentionally. However, McCorhill insists that KTO's subsequent failure to refund the money in its possession amounts to a misappropriation of these funds. McCorhill does not cite any cases to support this contention. KTO argues that since McCorhill has defaulted on its payment under the sales contract, it is loath to return this money for fear it will never otherwise be compensated. Additionally, KTO asserts that because it obtained a valid security interest in McCorhill's accounts receivable it is entitled to retain any proceeds in the event of default. McCorhill claims KTO does not have a valid lien on any of McCorhill's assets and contends KTO is not entitled to any rights that a valid lien would confer upon a secured creditor, namely retention of accounts receivable.

■ With regard to the validity and priority of KTO's lien on certain assets of Kraus Reprint and Kraus Periodicals (hereafter "KRKP"), this court, after motion and trial, determined that KTO has a valid first lien on the accounts receivable, the property, building and fixtures of KRKP, presently owned by and in the possession of McCorhill. *In re McCorhill Publishing, Inc.*, 86 B.R. 783 (Bankr.S.D.N.Y.1988). 11 U.S.C. § 552 governs the postpetition effect of a prepetition security interest. Section 552 provides,

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) ... [I]f the debtor an entity entered into a security agreement, before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security agreement extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law ...

■ The invalidation of prepetition security interests in postpetition accounts receivable, inventory, furniture, machinery, fixtures and equipment was designed to facilitate the debtor's "fresh start" by allowing the debtor to acquire postpetition assets free of prepetition liabilities. *In re Photo Promotion Associates, Inc.*, 53 B.R. 759, 763 (Bankr.S.D.N.Y.1985). The exception to this general rule, expressed in section 552(b), extends the prepetition security interest to postpetition proceeds and profits from prepetition collateral to the extent provided for in the security agreement. With this exception in mind this court finds that KTO is entitled to maintain its lien on any proceeds collected on prepetition accounts receivable. However, there is a distinction between the extension of a lien to postpetition proceeds, which confers a right upon a secured party to foreclose on the encumbered assets, and the right to possession of these proceeds. Although KTO did not take any affirmative action to obtain possession of these assets, by retaining the proceeds KTO is exercising a form of self-help that is not consistent with the Bankruptcy Code's fresh start policy.

■ A chapter 11 debtor is entitled to use all available cash received from prepetition and postpetition operations to reorganize its business pursuant to 11 U.S.C. § 363. In this case, the trustee has submitted several cash collateral orders to which KTO, a secured creditor, consented to the use of cash derived from assets upon which it has valid liens. In each cash collateral order KTO has been paid various amounts of money to reduce McCorhill's outstanding indebtedness. The retention of the $73,260.27 by KTO has deprived the debtor of its ability to use this cash toward the continuing operations and successful reorganization of the business. Assuming

the $73,260.27 is derived from prepetition accounts receivable, and such a distinction must be made between postpetition proceeds from prepetition account receivables and postpetition proceeds from postpetition accounts receivable, KTO may opt not to consent to the use of the proceeds pursuant to 11 U.S.C. § 363. KTO could require McCorhill to keep these proceeds in an escrow bearing account, but it may not have possession of these proceeds.

■ However, because the creditor has a valid security interest in McCorhill's accounts receivable and a mutual debt is owed by and between the KTO and McCorhill, KTO may setoff any proceeds received from *prepetition* accounts receivable pursuant to 11 U.S.C. § 553(a). Section 553(a) provides that when a prepetition mutual debt is owed between a debtor and a creditor, a creditor may setoff monies which it received from the debtor or a third party, that were not received from an affirmative enforcement of its security interest.

■ 11 U.S.C. § 542(b), dealing with the obligation to turnover property of the estate, provides in relevant part:

> ... [A]n entity that owes a debt that is property of the estate ..., shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under Section 553 of this title against a claim against the debtor.

Pursuant to section 542(b), KTO is not required to turnover those proceeds collected from prepetition accounts receivable. Furthermore, KTO is entitled to setoff monies from accounts receivable incurred prior to and during the 90 day period before McCorhill filed for bankruptcy in payment of prepetition receivables in compliance with section 553(b). Payment of a secured claim within the ninety day preferential period which does not exceed the value of the creditor's security interest and is not in preference to other *secured* creditors may not be recovered by the trustee. *Missionary Baptist Foundation of America,* 796 F.2d 752 (5th Cir.1986); *In re Santoro Excavating, Inc.,* 32 B.R. 947 (Bankr.S.D. N.Y.1983); *In re Hale,* 15 B.R. 565, 567 (Bankr.S.D.Ohio 1981). In this case, KTO is the first lienholder on McCorhill's accounts receivable. Because KTO's lien must be paid before junior lienholders are compensated, these lienholders are not detrimentally affected by this setoff.

#### (b) *The Misappropriated Inventory*

■ McCorhill presented evidence at trial which established that in or about June of 1984, Anthony Mitura, then an Operations Manager of KRKP, misappropriated 2 sets of Burlington Magazines and sold them to Guenther Sprunkel, a KTO employee whose employment contract was terminated by KTO by May of 1984. Mitura received a total of $3500 from Sprunkel from the sale of both sets of magazines. McCorhill claims that Mitura was employed and supervised by KTO at the time the thefts occurred. Additionally, McCorhill read various portions of testimony from Herbert Cohen's pretrial examination in which Cohen stated that he believed there were other misappropriations of inventory by KTO employees prior to McCorhill's acquisition of KRKP. McCorhill seeks a determination that KTO is liable for these misappropriations.

The evidence with regard to the misappropriation and sale of the two sets of Burlington Magazines is unrefuted. During Mitura's examination before trial from which the debtor read testimony into the record, he admitted he acquired the magazines in an unauthorized fashion. Although he refused to admit to accepting remuneration for the sale of these magazines, Sprunkel stated in his pretrial examination, portions of which were read into the record by McCorhill, that he compensated Mitura for the surreptitious sale by paying him $3500 in cash. As far as the other allegations with regard to further misappropriations of inventory by KTO employees, there is absolutely no evidence to support Cohen's accusations—no accounting or admissions by KRKP employees were proffered during trial. Considering the lack of evidence with regard to misappropriations other than that of the two sets of Burlington magazines, this court finds the record bereft of any basis upon which it can make

a finding with regard to other alleged misappropriations.

Although Mitura admitted he misappropriated and delivered the two sets of Burlington Magazines to Sprunkel, and Sprunkel compensated Mitura, KTO argues that because a representative of McCorhill, namely Herbert Cohen, visited the premises of KRKP to view the books and records and observe operations at least three or four times a week from mid-April to the end of June, at which time he was installed in an office at KRKP, that McCorhill could have been aware of the thefts. During this period of time, Cohen had access to all books and records, including accounts receivable and inventory and customer lists. Tager testified that Cohen was installed in KRKP as Chief Operating Officer in June and was running the business at the end of June. Mr. Tager stated that during this period of time Cohen was responsible for the supervision of all employees. However, because KTO compensated McCorhill for KRKP employee salaries and other expenses incurred by McCorhill through the end of July, McCorhill construes Mitura to be KTO's employee for that duration of time and concludes KTO is liable for Mitura's acts. McCorhill does not cite any cases to support this conclusion. After several delays and extensions by McCorhill, KTO and McCorhill conducted the closing of the sale on November 30, 1984. At that time no McCorhill representative mentioned, complained of or sought reimbursement for a shortage of inventory occurring prior to the closing.

McCorhill also claims that they were defrauded by the sale of Dr. Martin Saendig, Gmbh, an antiquarian book division located and incorporated in West Germany, to Guenther Sprunkel in May of 1984. Tager testified that the liabilities of Saendig exceeded its assets at the time of the sale and it was actually KTO's intention to dissolve the corporation until Sprunkel offered to operate the company. Pursuant to the terms of this sale Sprunkel was to assume certain liabilities with regard to contracts with Iranian entities and KTO agreed, by adjusting certain journal entries, to forgive a Saendig debt to KRKP in the amount of several hundred thousand German marks. Although McCorhill's argument is somewhat convoluted, it appears it believes that the debt of Saendig to KRKP, which was never paid because of the journal entries which reflected a forgiveness of the debt, deprived KRKP, and thereby McCorhill, of these monies.

With regard to the inventory misappropriated by Mitura, McCorhill argues that because KTO still owned and was in possession of KRKP that it was liable for the acts of its employees. Accordingly, McCorhill requests compensation for the misappropriated magazines which have a retail value of approximately $10,000 to $12,000. However, whether Mitura is determined to be KTO's or McCorhill's employee is not important. In order for an employer to be liable for the criminal acts of an employee, the act must generally be performed within the scope of the employee's job, must benefit the employer, or have resulted by the negligence or ratification of the employer. *International Distributing Corp. v. American Distributing*, 569 F.2d 136 (D.C. Cir.1977). Thefts committed by employees which are simply a "personal adventure", meaning it was for the personal gain of an employee, and which did not spring from any purpose to serve his employer do not render the company vicariously liable for loss to its customer, or in this case its vendee, on the theory of respondeat superior. *International Distributing Corp. v. American Distributing*, 569 F.2d at 139; *See Banque Worms v. Luis A. Duque Pena E Hijos, LTDA*, 652 F.Supp. 770 (S.D. N.Y.1986). Obviously, because KTO did not receive any remuneration and, in fact, was deprived of the retail sales income from the sale of these magazines, Mitura did not misappropriate these magazines to benefit KTO. Moreover, KTO did not have knowledge of, or direct Mitura's actions. In fact, McCorhill conceded that it did not believe that any officers or directors of KTO had knowledge of the theft. Additionally, no negligence has been evidenced on the part of KTO which result in liability for Mitura's conduct. Therefore, KTO is

not liable for the misappropriation by Mitura.

Where a party has access to books and records and fails to utilize this access to determine the accuracy of any representations, he is estopped from complaining he was induced to enter certain transactions. The Court of Appeals in *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 157 N.E.2d 597, held:

[I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or will not be heard to complain that he was induced to enter the transaction by misrepresentation.

*In re Domestic Fuel Corp.,* 79 B.R. 184 (Bankr.S.D.N.Y.1987). McCorhill obviously knew of the sale of Saendig to Sprunkel considering KRKP, under McCorhill's direction, sold inventory to Sprunkel for the operation of Saendig during the Spring and Summer of 1984. McCorhill had access to any and all of KTO's documents relating to the business of KRKP including inventory list and financials. McCorhill also had unlimited access to the premises since March of 1984, almost nine months prior to the November 30, 1984 closing date. Although access to books and record may not substitute for required revelation, *Weaver Organization, Inc. v. Manette,* 341 N.Y.S.2d 631, 634, 41 A.D.2d 138 there has been no substantiation by McCorhill that officers or directors of KTO knew of these alleged misappropriations.

### (c) *Reprint Contracts*

One of the terms of the closing required KRKP, as a division of KTO, to transfer its interest in certain reprint contracts with other publishers and authors. These reprint contracts permit KRKP the exclusive right to reprint named issues of work that are still in print or subsequently go out-of-print. [*See* Ex. D]. Many of these reprint agreements have a clause providing for the limitations on the assignment of a reprint contract. Generally, these clauses provide that KTO shall not assign, transfer or encumber the rights assigned except to a successor or affiliated corporation. No assignment shall relieve Kraus of its liability to the licensor. [*See* Ex. D].

McCorhill received an assignment of various reprint contracts. It now claims, however, that KTO committed fraud when it assigned the contracts to the McCorhill because McCorhill asserts it is neither a successor nor an affiliated corporation of KTO.

McCorhill is a successor under these agreements. A successor, with reference to a corporation, generally means another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes the burdens of the first corporation. *Wawak Co. v. Kaiser,* 90 F.2d 694, 697 (7th Cir.1937) ("[A] 'successor' is one who succeeds to take the place of another ... one who takes the place another has left and sustains the same part or character"); *Schumacher v. Shear Co.,* 59 N.Y.2d 239, 244, 464 N.Y.S.2d 437, 451 N.E.2d 195 (Ct. App.1983); BLACKS LAW DICTIONARY 1283 (5th ed. 1979). Accordingly, under this contract of purchase, McCorhill succeeded and took the place of KTO. Therefore, KTO's assignment of the reprint contracts complied with the assignment provisions of these agreements.

### (d) *Restrictive Covenant*

Section 12, clause (a) of the Memorandum of Closing states, in relevant part, The Seller shall not establish, engage in, or in any manner become interested in, directly or indirectly, as an owner, partner, agent, shareholder, or otherwise, any reprint publishing or reprint or antiquarian purchasing or sale business in competition with the Buyer within the geographic areas in which Seller previously operated for a period of 5 years from the Closing Date ... Because the breach or anticipated breach of this restrictive covenant will result in immediate and irreparable injury to the Buyer for which Buyer will not have an ade-

quate remedy at law, Seller agrees that the Buyer shall be entitled to sue in equity to enjoin such breach or anticipated breach and to seek any and all legal and equitable remedies to which the Buyer may be entitled. [Ex. 1]

The "Seller" in this agreement is defined as "Kraus-Thomson Organization Limited, a Liechtenstein corporation qualified to do business in New York, having an address at Route 100, Millwood, New York". [Ex. D].

McCorhill argues that because Hans Peter Kraus, a shareholder of KTO, owns and runs a business dealing in rare books that this is a violation of this restrictive covenant. McCorhill does not cite any cases to support a conclusion that a shareholder of a corporation would be bound by the terms of such a covenant. Although a shareholder is an owner of a corporation, the terms of this restrictive covenant only precludes KTO, as an entity, from engaging in or establishing a reprint or antiquarian business.

Additionally, Hans Peter Kraus owned and ran his rare books business years before this sale was closed. There is no indication in the Memorandum of Closing that the parties contemplated that Hans Peter Kraus would close or dissolve his business.

Even if Mr. Kraus could be bound by the terms of this Memorandum of Closing, the evidence produced by McCorhill is insufficient to establish that H.P. Kraus was indeed competing with the debtor. McCorhill produced a witness, Richard Koffler, who is purported to be an expert on rare books. Mr. Koffler was an employee of KRKP from approximately June of 1985, after McCorhill's acquisition, up to about a year and half ago. He was employed as Vice President of the Editorial Department. Prior to his employment with KRKP, he had been employed by Associated Faculty Press ["Associated"]. Mr. Cahill was CEO of Associated and attempted to merge this company with KRKP. Hence, Mr. Koffler's salary was paid by Associated while he worked for McCorhill. Mr. Koffler has not been associated with McCorhill since

early 1987 and is now self-employed as a consultant.

This court finds Mr. Koffler's testimony of little probative value. He testified that in order to determine the type of business H.P. Kraus conducts he went into the store to browse, picked upon a pamphlet entitled Publications and Catalogues [Ex. G], and later perused, very briefly, a computer printout of H.P. Kraus' inventory which listed thousands of rare books. [Ex. H]. He did not disclose to the employees at H.P. Kraus that he was present at the store to determine the nature of its business and therefore did not have an opportunity to see the operations, books or customer lists of H.P. Kraus. At no time did he testify that KRKP and H.P. Krause conducted similar businesses. Mr. Koffler's testimony consisted of a listing of the following categories of books which are both allegedly sold by KRKP and Kraus: (1) Americana—which category was described as including literature, essays, records, journals and other historical documents of the 18th Century; (2) Travel books—Which consist of journals, maps and charts; (3) Libraries of famous people, and; (4) 19th and 20th Century literature. There was no testimony with regard to the percentage of profits derived from the sale of the books in each category for each business. Additionally, Mr. Koffler testified that, of the thousands of books sold by H.P. Kraus, approximately 10 books or collections sold by KRKP are sold by H.P. Kraus.

With respect to the overall nature of the two businesses Mr. Koffler testified that 70% of KRKP's business was conducted in the sale of periodicals, as distinguished from rare books, and the other 30% dealt with the sale of odd lots of books, autographs and magazines and that the general nature of the business involved reprints. He then testified that H.P. Kraus only deals in rare books.

Further testimony disclosed that H.P. Kraus does not deal in reprints but sells facsimile editions of books, which Mr. Koffler described as replicas of an earlier book made in more recent times.

Based upon Mr. Koffler's testimony, there is absolutely no indication that H.P. Kraus competes with KRKP. KRKP conducts most of its business in the sale of periodicals, as opposed to H.P. Kraus, which deals exclusively in rare books. An overlap of types of books sold and the actual sale of a nominal amount of the same book by each business does not amount to competing businesses.

(e) *Expungment and Subordination*

In the event this court determined that KTO had improperly misappropriated inventory or knew of the misappropriation, misappropriated monies from KRKP, or violated the reprint contract or the restrictive covenant of the memorandum of closing, McCorhill seeks an expungment or subordination of KTO's claim pursuant to 11 U.S.C. §§ 502 or 510. This court finds no basis to expunge or subordinate KTO's validly secured claim. KTO dealt with McCorhill in good faith and was not responsible for any fraud, breach of contract or misappropriation.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(B), (C) and (K).

2. KTO has established by a preponderance of the evidence that it holds a valid secured claim against McCorhill in the amount of $3,473,112.00

3. Neither McCorhill, nor its Chapter 11 trustee, has sustained the affirmative defenses and counterclaims asserted in the answers interposed to KTO's complaint except to the extent of the Exchange Account balance of $73,260.27 held by KTO with respect to customer payments to McCorhill which were mistakenly forwarded to KTO.

4. KTO is entitled to a declaratory judgment determining that it holds a valid and secured first lien against McCorhill's accounts receivable and inventory and a valid, secured second mortgage, subject to the first mortgage held by the Greater New York Savings Bank with respect to the Millwood, New York real estate which

McCorhill transferred to New Castle. The net amount of KTO's secured claim is $3,399,851.73 comprised of the principal amount of $2,750,000 due under McCorhill's promissory note held by KTO, together with $723,112 in interest, calculated at the rate of 9 per cent per annum up to the filing date of the petition on March 12, 1987, less the $73,260.27 Exchange Account balance held by KTO.

SETTLE ORDER on notice.