In re Lawrence D. WRIGHT, a.k.a. Larry Wright, a.k.a Wright Nite Properties, a.k.a. Wagon Wheel Motel, a.k.a. Sahara Motel, a.k.a. Rendezvous Motor Inn, a.k.a. Wright Insurance Agency and Ann Marie Wright, a.k.a. Wright Nite Properties, a.k.a. Wagon Wheel Motel, a.k.a. Sahara Motel, a.k.a. Rendezvous Motor Inn, Debtors.

Olympic Coast Investment, Inc., Plaintiff,

v.

Larry D. Wright and Ann Marie Wright, Defendants.

Bankruptcy No. 99–43165–11.
Adversary No. 00/00034.

United States Bankruptcy Court, D. Montana.

Dec. 14, 2000.

Quentin M. Rhoades, W. Arthur Graham, Sullivan, Tabaracci & Rhoades, P.C., Missoula, MT, for Plaintiff.

Malcolm H. Goodrich, Goodrich Law Firm, Billings, MT, Gary S. Deschenes, Great Falls, MT, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

JOHN L. PETERSON, Bankruptcy Judge.

Defendants Lawrence and Ann Marie Wright ("Wrights") filed a voluntary Chapter 11 bankruptcy petition on December 17, 1999. On April 11, 2000, Plaintiff Olympic Coast Investment, Inc. ("Olympic") filed an adversary complaint against the Wrights seeking declaratory judgment under 28 U.S.C. § 2201 and F.R.B.P. 7001(9) that three promissory notes executed and delivered by the Wrights to Olympic are wholly valid, enforceable and unaffected by usury or fraud and that the Wrights are liable on all amounts accrued and owing, plus interest and other fees and/or costs as provided in the three promissory notes. The Wrights filed a Motion to Dismiss on May 19, 2000, alleging that Olympic's Complaint failed to state a claim upon which relief could be granted. The Wrights' motion for dismissal was denied in an Order entered May 31, 2000.

On June 16, 2000, the Wrights filed an Answer to Olympic's Complaint accompanied by a counterclaim, demand for jury trial and a request for an award of attorney's fees and costs. Olympic filed a timely reply to the Wrights' counterclaim on June 30, 2000, and the Wrights withdrew their demand for a jury trial on July 6, 2000. Thereafter, Olympic filed a Motion for Partial Summary Judgment on August 8, 2000, requesting that this Court determine that the Wrights' counterclaim based on usury be decided under the laws of the State of Washington, rather than the laws of the State of Montana. The Court, in an Order entered September 7, 2000, found that partial summary judgment was not appropriate and thus denied Olympic's motion.

The parties filed a joint Proposed Final Pretrial Order on September 21, 2000. The parties' Proposed Final Pretrial Order was followed by Olympic's second Motion for Partial Summary Judgment filed September 22, 2000. Olympic's motion was denied in an Order entered September 27, 2000. On October 10, 2000, the parties filed a Proposed First Amended Final Pretrial Order and subsequently, after due notice, trial was held October 11 and 12, 2000, at Butte. Quentin M. Rhoades and W. Arthur Graham appeared on behalf of Olympic and Gary S. Deschenes appeared on behalf of the Wrights. In addition, John R. Hoss ("Hoss") and Bob Hoss of Olympic testified as did Debtor/Defendant Lawrence D. Wright ("Larry"), Tim Watts ("Watts"), Walter Kero ("Kero") and Bill Darling ("Darling"). The Court did not allow Dr. Myles Watts to testify as an expert witness on behalf of the Wrights since Dr. Myles Watts was not disclosed by the Wrights as a potential expert witness prior to the trial. Olympic's Exhibits A, B1, B2, C through U, X and Y, and the Wrights' Exhibits 1, 2, 3, 5 through 24, 26 through 31, 33, 35, 36, 38 through 49, 51, 52, 52A and 53 were admitted into evi-

dence without objection. The admission into evidence of Exhibits 24 and 25 was denied. At the close of trial, the Court granted the Wrights ten days to file a post-trial brief, granted Olympic ten days thereafter to file a response brief and granted the Wrights an additional five days thereafter to file a reply brief. In an Order entered October 24, 2000, the Court extended the briefing dates to October 27, 2000, for the Wrights to file their opening brief, November 7, 2000, for Olympic to file a response brief, with the Wrights having an additional five days thereafter to reply to Olympic's response brief. On December 8, 2000, the Wrights were granted until December 4, 2000, to file their reply brief. The Wrights' "Brief in Response to Plaintiff's Post–Hearing Brief" was filed on December 5, 2000. All briefs have now been filed. Accordingly, the Court deems the record closed and the matter ripe for decision. After considering the testimony presented at trial, and after reviewing the record and applicable law, the Court finds for Olympic.

## BACKGROUND

The Wrights are residents of the State of Montana and are presently residing in Cascade County, Montana. Olympic is an investment company incorporated and registered in the State of Washington. The State of Washington is also Olympic's principal place of business. At all times relevant to this case, Olympic was a non regulated lender.

In December of 1996, the Wrights executed and delivered a promissory note to Olympic in the principle sum of $910,000.00 ("Note 1"), with interest payable at the rate of 12 percent per annum. Under Note 1, the net disbursement of proceeds in the sum of $346,390.48 was wired directly to the Wrights' bank account in Great Falls. Additionally, a Montana Trust Indenture was executed on December 11, 1996. The Wrights have not made all the payments due under Note 1.

In October of 1997, the Wrights executed and delivered a second promissory note to Olympic in the principle sum of $695,-000.00. The second promissory note was subsequently refinanced in December of 1997, with the Wrights executing and delivering to Olympic a promissory note in the sum of $1,220,000.00 ("Note 2"), also payable at the rate of 12 percent per annum. A Montana Trust Indenture was executed in connection with Note 2 on January 7, 1998. The Wrights obtained the net proceeds under Note 2 by Federal Express. The Wrights have not made all the payments due under Note 2.

Finally, the Wrights executed and delivered to Olympic, in June of 1998, a third promissory note in the sum of $3,550,000.00 ("Note 3") with interest payable at the rate of 13 percent per annum. The Wrights obtained the net proceeds from Note 3 at the offices of an escrow and closing agent in the State of Washington. The Wrights have not made all the payments due under Note 3.

Each of the three promissory notes executed and delivered by the Wrights to Olympic contain the following provision:

FOR VALUE RECEIVED, I promise to pay to the order of OLYMPIC COAST INVESTMENT, INC. at its office in Seattle, Washington, the Principal sum of . . .

\* \* \* \* \* \*

This Note is made under and shall be construed according to the laws of the State of Washington, and is secured by a Deed of Trust of even date.

The promissory notes further provide, with regard to the Deeds of Trust referenced above, that each "Trust Indenture is made within the State of Montana pursuant to the Small Tract Financing Act of Montana".

The Wrights sought the protections afforded by the Bankruptcy Code by filing a voluntary Chapter 11 bankruptcy petition on December 17, 1999. Olympic initiated the instant Adversary Proceeding against

the Wrights on April 11, 2000, seeking declaratory relief relative to obligations owed by the Wrights to Olympic arising by virtue of the three promissory notes. On June 16, 2000, the Wrights filed an Answer to Olympic's Complaint denying each of the allegations set forth therein. The Wrights also filed a counterclaim for damages claiming that the interest rate charged by Olympic under each of the three promissory notes is usurious.

## JURISDICTION

As set forth in the parties' Proposed Final Pretrial Order filed September 21, 2000, and Proposed First Amended Final Pretrial Order filed October 10, 2000, this Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334 as a proceeding arising under Title 11, United States Code. In addition, this is a core proceeding for purposes of § 157(b), (c), (k) and (o).

## ANALYSIS OF APPLICABLE LAW and DISCUSSION

I. Whether the choice of law provision set forth in the three promissory notes between the Wrights and Olympic is binding on Debtors.

After considering the evidence on the choice of law issue at the trial held October 11 and 12, 2000, the Court orally ruled that the Notes at issue in this case would be governed by Montana law. The Court entered its oral ruling for the sole purpose of allowing the parties to proceed with the presentation of this case on the merits of the Wrights' usury claim under Montana usury law.[1]

▉ In non bankruptcy cases, federal courts in diversity cases apply the choice-of-law rule of the state in which they sit. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir.1990) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). *See also, Van Gundy v. P.T. Freeport Indonesia*, 50 F.Supp.2d 993 (D.Mont.1999) ("A federal court sitting in diversity must apply the choice of law rules of the forum state to determine which state's substantive law applies."). However, the United States Supreme Court instructs:

In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, has no such implication. That case decided that a federal district court acquiring jurisdiction because of diversity of citizenship should adjudicate controversies as if it were only another state court. *See Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743. But bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.

*Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 239–40, 91 L.Ed. 162 (1946) *reh. denied* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947). Indeed, at least one bankruptcy court has noted:

A bankruptcy court in a core matter is not bound, as a court sitting in a diversity case, by the choice of law of the forum. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162, 67 S.Ct. 237, 239–40, 91 L.Ed. 162 (1946) *reh. denied* 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947). Thus, this court must apply the federal common law choice of law rule in order to determine the consequences resulting from the loan agreement between SFC and the debtor. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 121 (2d Cir.1984); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980) cert.

1. It is uncontested that the Wrights' usury claim would fail under Washington law.

denied 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *In re Perret*, 67 B.R. 757 (Bankr.N.D.N.Y.1986).

*McCorhill Publ'g, Inc. v. Greater New York Sav. Bank (In re McCorhill Publ'g, Inc.)*, 86 B.R. 783, 792 (Bankr.S.D.N.Y. 1988). Thus, even though Montana is the "forum" state, this Court must examine federal common law to determine whether this Adversary Proceeding should be decided according to the laws of the State of Montana or the laws of the State of Washington.

■ The parties in the case *sub judice* included a clear and unambiguous choice of law provision in the three Notes at issue; the promissory notes are to "be construed according to the laws of the State of Washington". Montana case law, which has expressly adopted various provisions of the federal common law, provides instructive guidance on the choice of law subject. *Casarotto v. Lombardi*, 268 Mont. 369, 886 P.2d 931 (1994), *rev'd on other grounds*, *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). In *Casarotto*, the Supreme Court of Montana adopted the Restatement (Second) of Conflict of Laws § 187(2)[2] as a guide—which the Court determined was consistent with its prior ruling in *Youngblood v. American States Ins. Co.*, 262 Mont. 391, 866 P.2d 203 (1993). *Id.*, 886 P.2d at 934 ("Restatement (Second) of Conflict of Laws § 187(2) (1971) is consistent with our decision in *Youngblood*, and expands upon the factors to be considered under the circumstances of this case."). *See also, Van Gundy v. Freeport Indone-*

*sia*, 50 F.Supp.2d 993; *Keystone, Inc. v. Triad Systems Corp.*, 292 Mont. 229, 971 P.2d 1240 (1998). The *Casarotto* Court engaged in a two step process to test the validity of a choice of law provision contained in a franchise agreement. *Id.* at 935. Under § 187, the Court in *Casarotto* first examined "whether Montana law would be applicable absent an 'effective' choice of law by the parties." *Id.* Second, the Court examined "whether application of Connecticut law would be contrary to a fundamental policy" of Montana. *Id.*

To resolve its first inquiry, the Court in *Casarotto*, like the bankruptcy court in *McCorhill*, examined the Restatement (Second) of Conflict of Laws § 188, which provides:

LAW GOVERNING IN ABSENCE OF EFFECTIVE CHOICE BY THE PARTIES

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

---

**2.** This section of the Restatement (Second) of Conflict of Laws provides:

Law of the State Chosen by the Parties:

\* \* \* \* \* \*

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transac-

tion and there is no other reasonable basis for the parties choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

The court in *Casarotto* found that Montana had a materially greater interest in the particular contract issue because the contract at issue was originally negotiated in Montana, the contract was to be performed in Montana, the subject matter of the contract was located in Montana, and the franchisees lived in Montana at the time the contract was executed. As a result of such finding, the court in *Casarotto* concluded that Montana law would apply absent an effective choice of law by the parties.

■ The instant case is factually distinguishable from the *Casarotto* case. The testimony at trial established that John Frankenfield ("Frankenfield"), an independent loan broker and business partner of the Wrights, approached Olympic at its office in Olympic, Washington, about the possibility of loaning the Wrights money. Olympic, Frankenfield and the Wrights corresponded and eventually negotiated Note 1 via telephone and mail. Once the major provisions of Note 1 were established, the Wrights flew to Washington to finalize the loan application and sign the necessary loan documents. Olympic then disbursed the funds for Note 1 from Seattle, Washington. Hoss testified that he believed Frankenfield was paid a 2%, or $18,200, broker fee on Note 1. Wrights agreed to remit their payments on Note 1 to Olympic "at its office in Seattle, Washington". Ex. A.

Note 2, which the Wrights allegedly sought to build a Motel 6, was also negotiated via telephone and mail. The loan application and other loan documents were mailed from Olympic in its Washington office to the Wrights in Montana. The documents were signed in Montana and returned to Olympic through the mail. Hoss understood that Frankenfield did not receive a finders' fee on Note 2 because, according to Larry, Frankenfield would be compensated later through his business dealings with the Wrights. The payments on Note 2 were to be made by the Wrights to Olympic "at its office in Seattle, Washington". Ex. I.

The Wrights again approached Olympic for funding to purchase 450 condominium units located in St. Marie, Montana. Negotiations on Note 3 thus began, again taking place over the telephone and by mail. The Wrights eventually signed the necessary loan documents for Note 3 at a hotel room in Great Falls, Montana. However, the closing of Note 3 occurred in Washington and the funds for Note 3 were, at the Wrights' request, disbursed from Seattle, Washington to an escrow company in Spokane, Washington.[3] In addition, when Larry Wright learned that Frankenfield was scheduled to receive a finders' fee on Note 3, Larry sent a letter to Olympic dated July 21, 1998, Exhibit S, which reads:

1. Total Finder Fees to be paid of $106,500.00.

2. Payment to John Frankenfield for purchase of Ford Truck @ $16,338.92.

3. Balance of $90,161.08 to be paid at closing in one check payable to Larry D. Wright, John Frankenfield and Ted Morris.

3. From the evidence, it appears the Wrights selected the escrow company in Spokane, Washington. The escrow company would, therefore, be an agent for the Wrights, thereby establishing the Wrights' presence in the State of Washington.

Olympic acceded to Larry's above request and issued check no. 2752 payable to "Larry D. Wright, John Frankenfield and Ted Morris". Ex. 43. The check was later cancelled and the funds were instead wired directly to Inland Northwest Bank in Spokane, Washington. Ex. Y. As with Notes 1 and 2, the Wrights were to remit the payments on Note 3 to Olympic "at its office in Seattle, Washington". Ex. O. All three Notes are secured by Deeds of Trust which were made within the State of Montana pursuant to the Small Tract Financing Act of Montana.

The foregoing facts clearly establish that Washington has the most significant relationship to the Notes in this case and there was a reasonable basis for the parties to chose Washington law as the applicable law to govern Notes 1, 2 and 3. Thus, under *Casarotto* and its application of the Restatement (Second) of Conflict of Laws, the Court's inquiry turns to whether Montana law would be applicable absent an effective choice of law by the parties and whether application of Washington law would be contrary to a fundamental policy of Montana.

▮▮ The Court turns to Restatement (Second) of Conflict of Laws § 188 to make the first of these determinations. As set forth in § 188, this Court should consider the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the residence or place of incorporation of the parties in accordance with the relative importance of each item with respect to the particular issue. In the instant case, negotiations took place between Washington and Montana and thus, the place of negotiation is not dispositive. Additionally, Debtors are residents of Montana while Olympic is incorporated and has its principal place of business in Washington and thus, this point weighs neither in Debtors' nor Olympic's favor. Next, the place or location of contracting appears to be Washington for Note 1 since that is where all the parties

were when the loan documents were signed. The place of contracting on Notes 2 and 3 appears to be Montana for the Wrights and Washington for Olympic. All three Notes, however, were "closed" in Washington. Thus, if this were the sole determining factor, the Court finds such factor would weigh in Olympic's favor. Finally, while the subject matter of the contract is located in Montana, the Court finds such point is outweighed by the fact that Washington is clearly the place of performance on all three Notes. In all, the most determinative factor—place of performance—establishes, to this Court's satisfaction, that the State of Washington has the most significant relationship to the Notes and to the Wrights and Olympic. Such finding furthers Montana's statutory choice of law provision set forth at Mont. Code Ann. § 28–3–102:

> A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place of performance, according to the law and usage of the place where it is made.

The Court's finding that the State of Washington has the most significant relationship to the Notes at issue nullifies the Wrights' claim of usury.

▮▮ Moreover, in addition to the foregoing, the Wrights' claim of usury is contrary to the teachings of the Restatement (Second) of Conflicts § 203:

> The validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188.

The term "substantial relationship" is explained in comment c as having a different meaning than the term "*most* significant relationship" as used in § 188. Under

§ 203, "a contract may have a 'substantial relationship' to two or more states; it can have its '*most* significant relationship' to only one." The contracts at issue in the instant case, namely Notes 1, 2 and 3, have a substantial relationship to both Montana and Washington and thus, under § 203 of the Restatement (Second) of Conflicts, the validity of Notes 1, 2 and 3 can be examined under either Montana law or Washington law.

The Court specifically rejects the Wrights' argument that "it is not correct to necessarily imply that a Montana court would utilize § 203 of the Restatement" and that Olympic is seeking application of § 203 in order to buffer the effects of Mont.Code Ann. § 31–1–107. Such arguments miss the point that this case is not a diversity action but rather, is an action to determine the allowance of a claim. As noted above, such claims are governed by federal common law. The bankruptcy court in *McCorhill* specifically found that the significant relationship test set forth in § 203 is appropriate and should apply in bankruptcy cases. 86 B.R. at 792. Moreover, both the state and federal courts in Montana have cited approvingly to the application of the Restatement (Second) Conflict of Laws and there is no reason to believe that the courts in Montana would not apply § 203 when so required. Indeed, § 203 furthers the policy set forth in Mont.Code Ann. § 28–3–201 that a "contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect if it can be done without violating the intention of the parties." Section 203 does not permit the application of laws from states chosen arbitrarily and which have no substantial relationship to the contract at issue. Thus, this Court concludes it is proper to apply § 203. In sum, the choice of law provisions contained in Notes 1, 2 and 3, in conjunction with the evidence presented at trial, would direct that both Washington's substantive law and Montana's substantive law can govern the Notes at issue.

The Court has already determined, under the § 188 inquiry—as discussed in *Casarotto*—that the State of Washington has the most significant relationship to the Notes at issue. The Court has also determined that both Washington and Montana have a substantial relationship to the matters at issue under § 203 and, therefore, it is proper to interpret Notes 1, 2 and 3 under the laws of the State of Washington. However, in applying § 203, the Court can also apply Montana law since Montana also has a substantial relationship to the matter at hand and thus, the Court is entitled to determine whether application of Washington's usury law is, under the facts of this case, contrary to a fundamental policy of Montana. The State of Washington's general usury law, set forth at RCW 19.52.020, provides:

(1) Any rate of interest shall be legal so long as the rate of interest does not exceed the higher of: (a) Twelve percent per annum; or (b) four percentage points above the equivalent coupon issue yield (as published by the Board of Governors of the Federal Reserve System) of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the later of (i) the establishment of the interest rate by written agreement of the parties to the contract, or (ii) any adjustment in the interest rate in the case of a written agreement permitting an adjustment in the interest rate. No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action.

Washington enacted its usury laws "in order to protect the residents of [that] state from debts bearing burdensome interest rates; and in order to better effect the policy of [that] state to use [its] policies and courts to govern the affairs of [its]

residents and the state; and in recognition of the duty to protect [its] citizens from oppression generally." RCW 19.52.005. Washington's usury law and the underlying policy therefore, as set forth above, is quite similar to, and in fact is more stringent than Montana's usury law set forth at Mont.Code Ann. § 31–1–107(1), which provides:

> Parties may agree in writing for the payment of any rate of interest that does not exceed the greater of 15% or an amount that is 6 percentage points per annum above the prime rate of major New York banks, as published in the Wall Street Journal edition date 3 business days prior to the execution of the agreement. Interest must be allowed according to the terms of the agreement.

The Montana Legislature has, with the enactment of Mont.Code Ann. § 31–1–107, established a policy—similar to the underlying policy of Washington's usury law—of protecting borrowers, who lack real bargaining power, from overreaching creditors. However, Washington law, at RCW § 19.52.080,[4] provides a significant exception to RCW § 19.52.020:

> Profit and nonprofit corporations, Massachusetts trusts, associations, trusts, general partnerships, joint ventures, limited partnerships, and governments and governmental subdivisions, agencies, or instrumentalities may not plead the defense of usury nor maintain any action thereon or therefor, and persons may not plead the defense of usury nor maintain any action thereon or therefor if the transaction was primarily for agricultural, commercial, investment, or business purposes: PROVIDED, HOWEVER, That this section shall not apply to a consumer transaction of any amount.
> Consumer transactions, as used in this section, shall mean transactions primarily for personal, family, or household purposes.

It is undisputed in this case that the Wrights sought and obtained the loans under Notes 1, 2 and 3 for commercial purposes. Indeed, Exhibit D reflects that the funds from Note 1 were utilized by the Wrights "for improvements to their motels, apartments and commercial buildings and to acquire additional real estate for business purposes." *See also,* Exhibit U, a handwritten note from Larry Wright to Olympic dated June 26, 1998, which recites that the Wrights would use the proceeds from Note 3 "to purchase units (Real Estate) in St. Marie, Montana and commercial."

The fact that the Notes at issue were used for commercial purposes removes the Notes from the ambit of RCW 19.52.020, and the 12 percent interest rate cap set forth therein, and places them squarely under RCW § 19.52.080, and its unlimited interest rate. The unlimited interest rate allowed under RCW § 19.52.080 is clearly at odds with Mont.Code Ann. § 31–1–107(1). Because the allowable interest rate in Washington for agricultural, commercial, investment, or business loans exceeds that allowed under Mont.Code Ann. § 31–1–107(1), the Court finds that loans governed by RCW § 19.52.080 do violate Montana's public policy if such loans contain interest rates in excess of 15 percent; the amount allowed under Mont.Code Ann. § 31–1–107(1). The next question the Court must therefore address, is whether the interest rates contained in Notes 1, 2 and 3 are usurious under Montana law.

II Whether the interest charged by Olympic on Note 1, Note 2 and Note 3 is usurious under Mont.Code Ann. § 31–1–107.

In Montana, interest is "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money." Section 31–1–104, MCA. Montana law further provides that

4. Montana law provides the same exception for regulated lenders at Mont.Code Ann. § 31–1–107(3). However, as noted above, Olympic does not come within the exception since Olympic was not a regulated lender at the times relevant to this case.

non regulated lenders may not charge a rate of interest that exceeds fifteen percent or which is six percentage points above the New York prime rate as reported in the Wall Street Journal three business days before the transaction in question.[5] Mont.Code Ann. § 31–1–107. Mont.Code Ann. § 108 instructs that an interest charge in excess of that allowed by Mont.Code Ann. § 31–1–107 is usurious.[6]

■■■■■ The question before the Court, therefore, is whether the interest rate charged by Olympic on Notes 1, 2 and 3 is usurious. Before making a specific finding regarding usury, the Court must first set the parameters upon which its decision will rest. For example, in *Brummer v. TMG Life Ins. Co., Inc. (In re Brummer)*, 11 Mont. B.R. 287, 147 B.R. 552 (Bankr.Mont. 1992), this Court held that additional fees and charges, such as finance charges and origination fees, which are deemed to constitute "interest", should be added to the stated amount of interest agreed upon by the parties when computing whether a contract contains a usurious rate of interest. This does not mean, however, that every fee or charge is considered interest for "it is equally well settled that 'a lender may properly exact from a borrower, in addition to interest at the highest lawful rate upon the money lent, reasonable fees or compensation for services rendered, or reimbursement of expenses incurred, in good faith, by the lender or his agent, in connection with the loan, without thereby rendering the transaction usurious, even though the services rendered or acts done be such as would ordinarily be performed by the lender in his own interest.'" *Bowden v. Gabel*, 105 Mont. 477, 76 P.2d 334, 336 (1938).

■■■ In *Brummer, supra*, this Court also adopted the spreading doctrine, which allocates the total interest provided for in a loan agreement over the full term of the loan. Thus, the Court specifically rejects any interest rate calculation which does not spread the origination fees and other such charges over the full terms of the loans.

As previously noted in this Order, Notes 1 and 2 have a stated or nominal interest rate of 12 percent per annum and Note 3 has a stated or nominal interest rate of 13 percent per annum. Starting with the nominal interest rates, Watts, an economist who was called as an expert by the Wrights, testified that the simple interest rate on Note 1, when the origination fee is spread over the term of the loan, is 16.35 percent. In reaching this interest calculation, Watts treated the origination fees of $91,000.00 and the service fee of $250.00 as interest. Watts obtained a "reduced principal balance" by subtracting the "origination" fees of $91,250.00 from the face amount of the loan. From this result, Watts then subtracted advance payments in the sum of $36,400.00 and interest from the date of the Note to January 1, 1997, to reach $779,013.37, which Watts describes as the "Principal Amount for Usury Calculation". Starting with this number, Watts created a spreadsheet and determined that the simple interest rate for Note 1 is 16.35 percent. Utilizing the same procedures for Notes 2 and 3, Watts obtained a simple

---

5. The prime interest rate did not exceed 9 percent in 1996, 1997 or 1998. Thus, 15 percent is the guide for determining whether an interest rate was usurious in Montana during 1996, 1997 and 1998.

6. Usury is statutorily defined as "[t]he taking, receiving, reserving, or charging" of an interest rate greater than the limit set by Mont. Code Ann. § 31–1–107. Mont.Code Ann. § 31–1–108. On the subject of usury, the Supreme Court of Montana writes:

It is, of course, elementary that "a contract or obligation for the payment of a sum of money larger than that actually lent to or due from the debtor is usurious if the difference between the face amount of the obligation and the sum actually received or owed by the debtor, when added to the interest, if any, stipulated in the contract, exceeds the return permitted by law upon the sum actually so received or due."
*Bowden v. Gabel*, 105 Mont. 477, 76 P.2d 334, 336 (1938).

interest rate of 15.06 percent on Note 2 and a simple interest rate of 16.08 percent on Note 3.

 Olympic's experts, Kero, a certified public accountant, and Darling, a mortgage banker, disagreed with Watts that the interest rates on Notes 1, 2 and 3 exceed 15 percent. Both Kero and Darling reached their opinion after calculating the Annual Percentage Rate ("APR") for each Note.[7] Darling testified that even though Olympic was not required to disclose APR to the Wrights in accordance with the Truth and Lending provisions as set forth in Regulation Z at 12 C.F.R. § 226.1, APR, nonetheless, accurately embodies Montana's statutory definition of interest. Therefore, both Kero and Darling agreed it was appropriate to use APR as a basis for determining whether the interest rates charged by Olympic were usurious. The Court agrees that APR provides persuasive guidance on whether an interest rate charged by a lender is usurious.

On cross-examination, Watts testified he was not sure what would constitute an origination fee for purposes of performing interest calculations under Regulation Z but indicated that his simple interest calculations were based upon his economic and agricultural experiences. Watts also testified that he was not aware of any standard formula or methodology used by the financial industry for the calculation of interest, which is not surprising since—as noted earlier—Watts' primary focus is on economics and agriculture. Finally, Watts testified that he was familiar with the term "APR" but had never used it in his economic consulting business.

Olympic's expert witnesses, on the other hand, were quite familiar with the term "APR", and in fact, were also familiar with the practices utilized in the financial industry, including the standard formulas and methodologies used to calculate interest.

Neither Kero nor Darling, who each used widely accepted, standardized software to calculate APR, were able to recalculate Watts' interest calculations.

 The United States Supreme Court, in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), instructs that "when the testimony of a witness is not believed, the trier of fact may simply disregard it." *See also, United States v. Garcia–Duarte*, 718 F.2d 42, 48 (2nd Cir.1983) (When the credibility of a witness is challenged, the finder of fact is "entitled to reject his testimony, in whole or in part."). Based upon the foregoing discussion on the calculation of interest, the Court finds that Watts' interest calculations and his testimony associated therewith is simply not credible. Therefore, Watts' testimony is disregarded by the Court. The Court does find the testimony of both Kero and Darling credible and, therefore, adopts the interest calculations performed by Kero as set forth in Exhibit X.

 As noted above, Kero determined that the APR on Note 1 is approximately 14.839; approximately 12.851 on Note 2; and approximately 14.429 on Note 3. On Note 3, a question was raised as to whether the sum of $90,161.08—as identified in Exhibit S—should be treated as interest. The Wrights assert that the sum of $90,161.08 is a fee that should be treated as interest and included in the usury calculation. The Court disagrees. At Larry's direction, the sum of $90,161.08 was wired directly from Olympic's bank account to Inland Northwest Bank in Spokane. There is no evidence in the record to show that Olympic benefitted in any way from the $90,161.08. Accordingly, the $90,161.08 is not treated as interest for the purposes of determining whether the interest rate charged in Note 3 is usurious.

7. APR has been described as the cost of credit on a yearly basis expressed as a percentage; an amount which represents the true, objective and accurate cost of borrowing money.

Furthermore, Ninth Circuit and Montana case law suggests that lenders may lawfully charge for reasonable services and that the charge for such services will not be treated as interest when determining when a charge of interest is usurious. *S & N Equip. Co. v. Casa Grande Cotton Fin., Co.*, 97 F.3d 337, 342 (9th Cir.1996); *Bowden*, 76 P.2d at 336. In *S & N Equip.*, the Ninth Circuit—interpreting Arizona law—determined that fees which are commensurate with and reasonable in relation to services rendered, will not be treated as interest. In this case, the evidence shows that Olympic provides unique and valuable services to borrowers who are unable to obtain financing through conventional avenues. As Hoss testified, Olympic first does an investigation of the potential borrower and the property at issue. If Olympic is comfortable with the potential borrower after the investigation, Olympic's trained staff then begins marketing the loan to prospective investors. Once the money is obtained, Olympic's staff prepares the necessary paperwork, closes the loans, assigns participation interests to the investors and prepares final closing packages for the investors. For instance, in the case *sub judice*, Olympic obtained 41 investors for Note 1; 51 investors for Note 2; and 97 investors for Note 3.

Hoss testified that in 1999, Olympic's overhead, excluding compensation to the three owners of Olympic, was approximately 4.6 percent of the 1999 loan originations. The 4.6 percent number does not take into account the tax consequences of the transactions, but does account for the broker fees, such as the fees paid to Frankenfield. Neither Kero nor Darling excluded any amount for the services rendered by Olympic. However, if an amount for reasonable services were considered, the loan origination fees would be reduced from $91,000.00 to $86,814.00 on Note 1, from $34,775.00 to $32,862.38 on Note 2 and from $355,000.00 to $338,670.00 on Note 3 and as a result, the interest rates calculated by Kero on Notes 1, 2 and 3 would be reduced even further below his prior calculations of 14.839, 12.851 and 14.429. This fact conclusively establishes that the interest rates charged by Olympic on Notes 1, 2 and 3 are not usurious in violation of Montana law.

The Wrights have failed to establish that the choice of law provisions contained in the three Notes were not effective. But, even if the choice of law clause was not effective, the Wrights have also failed to establish, by a preponderance of evidence, that the interest rates charged by Olympic are usurious under Montana law. Thus, Olympic should prevail on its claims. However, the Wrights posit one further argument which warrants discussion.

The Wrights contend in their most compelling usury argument that the Notes are facially usurious because the Notes provide for a default interest rate of 5 percent which, when added to the Notes' nominal or stated interest rates, exceeds the Montana maximum rate of 15 percent. In making this argument, the Wrights contend that the Montana usury statute at Mont.Code Ann. § 31–1–108(1) includes not only the charging of a usurious rate but also "reserving" such rate in the written Notes. In *Anderson v. Traveler's Ins. Co.*, 13 Mont. B.R. 91 (D.Mont.1993), Judge Hatfield held:

> Mont.Code Ann. § 31–1–108, provides that a party commits usury if it engages in the:
>
>> "taking, receiving, reserving, or charging a rate of interest greater than is allowed by 31–1–107 . . . ."

This statute applies in the disjunctive. If Travelers *either* charges usurious interest, *or* reserves *(i.e.* contracts for) usurious interest, the penalty provisions under § 31–1–108 are triggered. When the latter occurs, the note is usurious on its face. Although the Andersons' amended complaint appears to allege only a wrongful charging of interest, both theories of liability are advanced in the Andersons' briefs, and discussed by

the bankruptcy court. Since Travelers raises no objection to the unpled theory of liability, and specifically requests this court to address both theories, each is discussed below. The court raises this issue only to point that a claim based upon an unlawful "charging" of usurious interest is separate and distinct from a claim alleging an unlawful "reserving" of usurious interest. The distinction is insignificant in the instant case since Travelers in liable under either theory.

However, a corollary to the above rule on "reserving" interest by contract is that the lender has the right to unilaterally invoke and revoke the delay interest provisions. In fixing damages in *Anderson v. Travelers,* the Montana Federal District Court notes, as did the bankruptcy court [in *Anderson v. Travelers Ins. Co. (In re Anderson),* 10 Mont. B.R. 256, 272 (Bankr. Mont.1992)], that "due to Travelers' unilateral reduction of the delay interest rate to 17%[8] effective October 21, 1991, post-acceleration delay interest must be adjusted downward to reflect this reduction in the delay rate." 13 Mont. B.R. at 113, fn. 29. This is consistent with *Scarr v. Boyer,* 250 Mont. 248, 818 P.2d 381, 383 (1991), where the Supreme Court noted that the lender abandoned its claim for delay interest at the pre-trial proceeding and thus stopped the default interest penalty from running. *Scarr* holds that where the lender charges post-default usurious interest during any period of time after default, such charges violate the usury law only for the period of time the post-default charge is made and the penalty is to be applied to the interest charged during that term. *Id.* at 383. Following *Scarr,* Judge Hatfield noted in *Anderson* that Travelers had the right "to take precautions to minimize its exposure to usury penalties" by lowering the delay interest rate on the notes to levels consistent with Mont.Code Ann. § 31–1–107. Noting Travelers waited until October 21, 1991, to unilaterally reduce the delay rate

on one note, the penalty never applied after that October date.

In the case *sub judice,* Olympic, before collection on the Notes, specifically refused to calculate the interest at the default rate and indeed never calculated nor included delay or default interest in its payoff figures. Exhibits 35 and 38. Thus, the default interest rates in the Notes has no bearing on an usury calculation since Olympic unilaterally stopped any penalty by electing to assert only the legal rates in the Notes and specifically abandoned the default rate provision, thus saving itself from penalty.

### CONCLUSION

After carefully considering the record, the law and the testimony of the parties, the Court finds Olympic's request for declaratory judgment under 28 U.S.C. § 2201 and F.R.B.P. 7001(9) was lodged for good cause and finds that Notes 1, 2 and 3, which were executed and delivered by the Wrights to Olympic, are wholly valid, enforceable and unaffected by usury or fraud and that the Wrights are liable on all amounts accrued and owing, plus interest and other fees and/or costs as provided in Notes 1, 2 and 3.

IT IS THEREFORE ORDERED a separate Judgment shall be entered in favor of Plaintiff, Olympic Coast Investment, and against Debtor/Defendants, Lawrence D. and Ann Marie Wright; and the Promissory Notes which were executed and delivered by Larry and Ann Marie Wright to Olympic Coast Investment, Inc., are wholly valid, enforceable and unaffected by usury or fraud and Larry and Ann Marie Wright are liable on all amounts accrued and owing, plus interest and other fees and/or costs as provided in Notes 1, 2 and 3.

---

**8.** This rate was lawful at the time under Mont.Code Ann. § 31–1–107(1) since the prime rate was 11 percent.